## GREAT NORTHERN RAILWAY COMPANY *v.* STATE OF MINNESOTA.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 359.  Argued November 5, 8, 1909.—Decided February 21, 1910.

A state legislature, unless restrained by the constitution of the State, may contract to limit the State's power of taxation; but, as taxation is essential to the existence and operation of government, an exemption therefrom will not be presumed from doubtful language, but must be expressed beyond reasonable doubt.

When a State becomes the owner by purchase of the entire property and franchises of a corporation created by itself, it can only convey the same pursuant to the provisions of the then existing constitution and it cannot reinvest either a purchaser or the original owner with any exemption from taxation prohibited by the existing constitution.

---

setts, 268; *Perkins* v. *Boothby,* 71 Maine, 94, 97; *Bank of Lakin* v. *National Bank,* 57 Kansas, 183.

Where the constitution of the State requires equal and uniform taxation of all real and personal property in the State upon a cash basis and specifies the property that can be exempted, the legislature cannot thereafter agree that the payment of a given per cent. of the earnings of a corporation from property of a class not included among the properties that can be exempted shall be in lieu of all other taxation; and such a contract, if attempted to be made, would not be protected by the impairment of obligation clause of the Constitution of the United States.

There is a difference between a contract for a commuted system of taxation on earnings of a railroad corporation and a specific exemption from taxation of lands granted to the corporation, for a defined period; the former is personal and not assignable while the latter is attached to and follows the land.

In this case this court accepts the view of the state court as to the scope of its own decisions.

106 Minnesota, 303, affirmed.

THE facts are stated in the opinion.

*Mr. William R. Begg* for plaintiff in error:

The decision of the Supreme Court of Minnesota in this cause is not controlling upon the questions presented by the assignments of error.

Where the claim is that a contract is impaired by a state law this court determines for itself the existence and scope of the contract and whether it is impaired by the law as construed by the highest court of the State. *Bank* v. *Skelly*, 1 Black, 436, 443; *Insurance Co.* v. *Debolt*, 16 How. 415, 451; *Wright* v. *Nagle*, 101 U. S. 791, 793; *Burgess* v. *Seligman*, 107 U. S. 20, 33; *Railroad Co.* v. *Palmes*, 109 U. S. 244, 256; *Gas Co.* v. *Gas Light Co.*, 115 U. S. 683, 692; *Railroad Co.* v. *Dennis*, 116 U. S. 665, 667; *Railroad Co.* v. *Alsbrook*, 146 U. S. 279, 293; *Bryan* v. *Board*, 151 U. S. 639, 650; *Railroad Co.* v. *Tennessee*, 153 U. S. 486, 492; *Douglas* v. *Kentucky*, 168 U. S. 488, 502; *Stearns* v. *Minnesota*, 179 U. S 223, 233; *Muhlker* v. *Railway Co.*, 197 U. S. 544, 570; *Powers* v. *Railway Co.*, 201 U. S. 543, 546.

But the law as it has been declared by the state court at the date when the contract was made, enters into and becomes a part of the contract. *Bronson* v. *Kinzie*, 1 How. 311, 315; *McCracken* v. *Hayward*, 2 How. 608, 612; *Gelpcke* v. *Dubuque*, 1 Wall. 175, 177; *Walker* v. *Whitehead*, 16 Wall. 314, 317; *Edwards* v. *Kearzey*, 96 U. S. 595, 601; *Douglas* v. *Pike County*, 101 U. S. 677; *Railroad Co.* v. *Hamblen County*, 102 U. S. 273, 277; *Wilson* v. *Gaines*, 103 U. S. 417, 422; *Taylor* v. *Ypsilanti*, 105 U. S. 60, 71; *Green County* v. *Conness*, 109 U. S. 104, 105; *Bank* v. *Franklin County*, 128 U. S. 526; *Los Angeles* v. *Water Co.*, 177 U. S. 558; *Bradley* v. *Lightcap*, 195 U. S. 1, 20.

The settled rules of property existing at the time a contract is made are just as much a part of that contract as are the covenants of the parties; and the law which has thus entered into the contract cannot be abrogated or changed by subsequent decisions so as to save legislation enacted after the date of the contract. Cases *supra* and *Hardin* v. *Jordan*, 140 U. S. 371, 380.

Where the Supreme Court of a State has sustained the validity of a statute from which a contract arises, this court accepts that decision. *Powers* v. *Railway Co.*, 201 U. S. 543, 556.

The act of May 22, 1857, and the acceptance thereof by the Minnesota Company created a valid and irrepealable contract relating to the taxation of the railroads authorized by the act. *Home* v. *Rouse*, 8 Wall. 430, 438; *Railroad Co.* v. *Reid*, 13 Wall. 264; *Humphrey* v. *Pegues*, 16 Wall. 244, 249; *Delaware Railroad Tax Case*, 18 Wall. 206, 225; *Railroad Co.* v. *McGuire*, 20 Wall. 36, 43; *Railroad Co.* v. *Decatur*, 147 U. S. 190, 201; *Railroad Co.* v. *Tennessee*, 153 U. S. 486; *Powers* v. *Railway Co.*, 201 U. S. 543; *First Div. Co.* v. *Parcher*, 14 Minnesota, 297; *Railway Co.* v. *Pfaender*, 23 Minnesota, 217, 223; *St. Paul* v. *St. Paul & S. C. R. Co.*, 23 Minnesota, 469, 474; *Stevens County* v. *Manitoba Co.*, 36 Minnesota, 467, 471; *State* v. *Stearns*, 72 Minnesota, 200, 223; *Traverse County* v. *Manitoba Co.*, 73 Minnesota, 417, 426.

There were no constitutional restrictions upon the power

of the Territory to create corporations by special act and to make valid contracts with respect to taxation. Cases *supra,* and *People* v. *Marshall,* 6 Illinois, 672.

The act in question was passed by the legislative assembly of the Territory and accepted by the Minnesota Company prior to the admission of the State into the Union.

The benefit to accrue to the public from the enterprise contemplated by the charter is a sufficient consideration for the contract. Cases *supra,* and *Tomlinson* v. *Jessup,* 15 Wall. 454, 459; *Railroad Co.* v. *Decatur,* 147 U. S. 190, 201.

The contract created by the act of May 22, 1857, is an entire and inseparable contract covering the taxation of both the railroads and the granted lands. *New Jersey* v. *Yard,* 95 U. S. 104, 116; *Stevens County* v. *Manitoba Co.,* 36 Minnesota, 467; *Traverse County* v. *Manitoba Co.,* 73 Minnesota, 417, 423; Ch. 253, Laws, 1901; *Railway Co.* v. *Pfaender,* 23 Minnesota, 217; *State* v. *Manitoba Co.,* 30 Minnesota, 311; *State* v. *Northern Pac. Ry. Co.,* 32 Minnesota, 294; *State* v. *Northern Pac. Ry. Co.,* 36 Minnesota, 207; *State* v. *Luther,* 56 Minnesota, 156; *Todd County* v. *Manitoba Co.,* 38 Minnesota, 534.

The State cannot take the benefits of the contract without making compensation therefor. *Bridge Co.* v. *Dix,* 6 How. 507, 534; *Gas Light Co.* v. *Light Co.,* 115 U. S. 650; *Stearns* v. *Minnesota,* 179 U. S. 256, distinguished.

The legislature of the State had power under the constitution to make a valid and irrepealable contract modifying the provisions as to taxation of the act of May 22, 1857. Cases *supra.*

The vicissitudes through which these four original land-grant companies passed are stated in *Huff* v. *Winona & St. Peter Co.,* 11 Minnesota, 181; *Fitz* v. *Minnesota Central Co.,* 11 Minnesota, 414; *First Div. Co.* v. *Parcher,* 14 Minnesota, 297; *State* v. *Winona & St. Peter Co.,* 21 Minnesota, 315; *St. Paul* v. *St. Paul & Sioux City Co.,* 23 Minnesota, 469, 472.

It was within the power of the State, acting as trustee of the land-grant, to make such contract with reference to the tax-

ation of the roads for whose benefit the grant was made as in its opinion would best accomplish the objects of the trust.

The contract does not create an exemption from taxation but provides a commuted or substituted form of taxation. It is a tax against property, not against the person. *Stearns* v. *Minnesota*, 179 U. S. 223; *St. Paul* v. *St. Paul S. C. R. Co.*, 23 Minnesota, 469, 471; *State* v. *Nor. Pac. Co.*, 32 Minnesota, 294, 295; *Hennepin County* v. *Manitoba Co.*, 33 Minnesota, 534, 535; *County of Ramsey* v. *Railway Co.*, 33 Minnesota, 537; *County of Todd* v. *Manitoba Co.*, 38 Minnesota, 163; *St. Paul* v. *Manitoba Co.*, 39 Minnesota, 112, 113; *State* v. *Luther*, 56 Minnesota, 156, 160; *Traverse County* v. *Manitoba Co.*, 73 Minnesota, 417, 425; *State* v. *Koerner*, 85 Minnesota, 149, 150; *State* v. *Telephone Co.*, 120 N. W. Rep. 534, 538.

The contract was not personal to the Minnesota Company, but with the railroads and the other franchises, powers, privileges and immunities granted by the charter, was transferable to the successors of that company. Cases *supra*, and *First Div. Co.* v. *Parcher*, 14 Minnesota, 297; *County of Nobles* v. *Railroad Co.*, 26 Minnesota, 294, 298; *County of Ramsey* v. *Railway Co.*, 33 Minnesota, 537; *Board* v. *Railroad Co.*, 49 N. J. Law, 193; *S. C.*, 7 Atl. Rep. 826, 838.

The State of Minnesota, the St. Paul Company, the First Division Company and the Manitoba Company successively acquired by transfer all the franchises and immunities, including the franchise to be a corporation, granted to the Minnesota Company by the act of May 22, 1857.

The contract as to taxation is a right which passed by transfer under the description "property, franchises, rights and privileges." Cases *supra*, and *Railroad Co.* v. *Maryland*, 10 How. 376, 394; *Tomlinson* v. *Branch*, 15 Wall. 460; *Humphrey* v. *Pegues*, 16 Wall. 244, 247; *The Delaware Railroad Tax Case*, 18 Wall. 206; *Railroad Co.* v. *Georgia*, 92 U. S. 665; *Railroad Co.* v. *Virginia*, 94 U. S. 718; *Green County* v. *Conness*, 109 U. S. 104; *Railroad Co.* v. *Wright*, 116 U. S. 231; *Tennessee* v. *Whitworth*, 117 U. S. 139, 146; *Given* v. *Wright*, 117 U. S. 648.

Neither the transferability of the contract as to taxation nor the capacity of the St. Paul Company, the First Division Company, the Manitoba Company and the plaintiff in error to acquire the contract has been destroyed by the constitution of the State of Minnesota.

Such was the settled rule of law in Minnesota until the decision in the present case. The rule was an established rule of property.

A valid contract cannot be affected any more by constitutional amendment than by act of legislature. *Gunn* v. *Barry,* 15 Wall. 610, 623; *State* v. *Young,* 29 Minnesota, 474, 550; *Dartmouth College Case,* 4 Wheat. 518, 652; *Planter's Bank* v. *Sharp,* 6 How. 301, 321; *Walker* v. *Whitehead,* 16 Wall. 314; *Railway Co.* v. *Texas,* 170 U. S. 243, 256.

Constitutional provisions do not enter into the merger or prevent the acquisition by the absorbing company of the franchises and immunities of the merged companies. *State* v. *Railroad Co.,* 45 Maryland, 361; *Tomlinson* v. *Branch,* 15 Wall. 460; *Charleston* v. *Branch,* 15 Wall. 470; *Branch* v. *Charleston,* 92 U. S. 677; *Railroad Co.* v. *Georgia,* 98 U. S. 359; *Railroad Co.* v. *Maine,* 96 U. S. 499; *Shields* v. *Ohio,* 95 U. S. 319; *Railroad Co.* v. *Palmes,* 109 U. S. 244; see also *Railroad Co.* v. *Commissioners,* 112 U. S. 609; *Railroad Co.* v. *Berry,* 113 U. S. 465; *Railroad Co.* v. *Miller,* 114 U. S. 176; *Railroad Co.* v. *Missouri,* 152 U. S. 301; *Bank* v. *Tennessee,* 161 U. S. 186; *Railroad Co.* v. *Adams,* 180 U. S. 1; *Railroad Co.* v. *Hewes,* 183 U. S. 66; *Railroad Co.* v. *Maryland,* 187 U. S. 258; *Traction Co.* v. *Algelt,* 200 U. S. 304; *Railway Co.* v. *Rochester,* 205 U. S. 236; *Railroad Co.* v. *Vicksburg,* 209 U. S. 358.

*Mr. George T. Simpson,* Attorney General of the State of Minnesota, and *Mr. George W. Peterson,* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit by the State of Minnesota against the Great North-

ern Railway Company, a corporation organized and existing under the laws of that State, has for its object to recover the balance alleged to be due the State on account of taxes from the railway company, under a statute known as Chapter 253 of the General Laws of Minnesota of 1903.

The controlling question in the case relates to the constitutionality of certain sections of that statute, as follows: "§ 1. Every railroad company owning or operating any line of railway situated within or partly within this State shall, during the year 1905, and annually thereafter, pay into the treasury of this State in lieu of all taxes and assessments upon all property within this State owned and operated for railway purposes by such company, including the equipment, appurtenances, appendages and franchises thereof, a sum of money equal to *four* per cent of the *gross earnings* derived from the operation of such line of railway within this State; and the annual payment of such sum shall be in full *and in lieu of all other taxes and assessments upon the property and franchises so taxed.* The lands acquired by public grants shall be and remain exempt from taxation until sold or contracted to be sold or conveyed, as provided in the respective acts whereby such grants were made or recognized. § 2. The term 'gross earnings derived from the operation of such line of railway within this State' as used in section one of this act is hereby declared and shall be construed to mean all earnings on business beginning and ending within the State and a proportion based upon the proportion of the mileage within the State to the entire mileage over which such business is done of earnings  ι all interstate business passing through, into or out of the State." Gen. Laws, Minn., 1903, c. 253, p. 375.

The effect of the statute, Minnesota asserts, was to place the Great Northern Railway Company, as to rates, on the same basis of taxation as other railroads in the State. But, the company contended in the courts below, and contends here, that the requirement to pay for 1905 and annually thereafter *four* per cent of the gross earnings derived from the operation

of its railroad within the State was in violation of a statute enacted May 22d, 1857, by the Territory of Minnesota, incorporating the Minnesota and Pacific Railroad Company, and which fixed *three* per centum of the gross earnings of that company's railroad property as a tax in lieu of all taxes and assessments whatever. Sess. Laws, Minn., 1857, Extra Sess., §§ 1, 4, 18. The provisions in the latter statute, it is alleged, constituted a contract with that company, (the remote predecessor of the defendant company), which was protected, in favor of the latter, by the contract clause of the Constitution of the United States, as well as by the clause of the Fourteenth Amendment forbidding the deprivation of property without due process of law. All this was disputed by the State.

The gross earnings of the company during 1905 were, it is conceded, $18,540,396.27, four per cent of which, $741,615.85, the State demanded under the act of 1903. The company paid $620,878.47 on account of gross earnings for 1905, and refused to pay more. For the difference, $120,737.38, with interest, the State claimed judgment. The railway company admitted its liability to pay four per cent on the gross earnings derived from certain lines operated by it in 1905, but denied liability in excess of three per cent on the gross earnings derived, during the same period, from certain other lines. It insisted that the sum paid by it before being sued herein was all that could be legally demanded by the State for the year 1905.

The trial court made certain findings of fact and announced certain conclusions of law that were not satisfactory to either party. But it was stipulated that, on the basis of those findings and conclusions, the State would be entitled to a judgment for $32,285.94, with interest from July 11th, 1898, and costs; and for that sum judgment was given by the trial court against the railway company. Each party prosecuted an appeal to the Supreme Court of Minnesota. That court sustained the State's appeal and reversed the judgment with directions to enter judgment in favor of the State for the entire amount it had

sued for—$120,737.88, with interest.  106 Minnesota, 303. Hence this writ of error by the railway company.

It is necessary to a clear understanding of the question of contract, as well as the objections raised against the act of 1903, that we state certain facts in the history of the taxation of railroad property in Minnesota.

By an act approved February 26th, 1857, Congress authorized the people of the Territory of Minnesota to form a constitution preparatory to its admission into the Union as a State on an equal footing with the original States.  11 Stat. 166, c. 60.  And by an act passed March 3d, 1857, it made a grant of lands to the Territory to aid in the construction of railroads between certain points with branches between certain other points, and provided that the lands so granted should be subject to the future disposal by the Legislature of the Territory or future State for the purposes expressed by Congress, and no other.  11 Stat. 195, 196, c. 99, §§ 1, 3.

In execution of the trust created by that act of Congress, the Legislative Assembly of the Territory, by the above act of May 22d, 1857, incorporated the Minnesota and Pacific Railroad Company, investing it with all the powers, privileges, franchises and immunities incident to a corporation, and empowering it to survey, locate, construct, maintain and operate a railroad with one or more tracks or lines between certain named places; to which end it was authorized to enter upon and appropriate lands belonging to the Territory or future State, not exceeding a prescribed width throughout the entire length of its railroad.  Sess. Laws Minn., 1857, Extra Sess., p. 1, §§ 1, 4, 18.

The 18th section of the latter act constitutes an important feature in this case.  So much of that section as is material in determining this case is as follows: "*In consideration of the grants, privileges and franchises* herein conferred on the said Minnesota and Pacific Railroad Company, the said company shall and will, on or before the first day of March in each year,

pay into the treasury of the Territory or future State, *three per centum* of the *gross earnings* of the said railroad, for the year ending on the last day of the preceding December, *in lieu of all taxes and assessment whatever,* . . . and for securing to the Territory or State the payment of the aforesaid per centum it is hereby declared that the State shall have a lien upon the railroads of the said company, and upon all other property, estate and effects of the said company, whether real, personal or mixed, and the lien hereby secured shall take and have precedence of all demands, decrees and judgments against the said company. The first payment shall be made on the first day of March next after fifty miles of said railroad shall be completed, and such payment shall be in lieu of all taxes and in full of all claims of the Territory or State for the grant hereby made, *and in consideration of such annual payments* the said company shall be *forever exempt from all assessments and taxes* whatever by the Territory or State which shall succeed the Territory, or by any county, city, town, village or other municipal authority in the Territory or State upon all stock in the said 'Minnesota and Pacific Railroad Company,' whether belonging to said company or to individuals, and upon all its franchises or estate, real, personal, or mixed, held by said company, and said *land* granted by said act of Congress hereby authorized to be conveyed to the said Minnesota and Pacific Railroad Company shall be *exempt from all taxation till sold and conveyed by said company.*" This act, it must be remembered, was passed before Minnesota became a State.

By an act approved May 11th, 1858, Minnesota was admitted into the Union as a State, with the constitution it had adopted by popular vote on the thirteenth of October previous, 11 Stat. 285, c. 31; which constitution provided that all taxes to be raised in the State "shall be as *nearly equal as may be,* and *all* property on which taxes are to be levied shall have *a cash valuation* and *be equalized and uniform throughout the State.*" Another section in the same article required that

"laws shall be passed taxing all moneys, credits, investments in bonds, stock, joint stock companies or otherwise, and also *all* real and personal property, *according to its true value in money;*" also, that certain specified kinds of property, devoted to charitable and public uses, "shall, by general laws, be exempt from taxation." Art. 9, §§ 1, 3. But *railroad property was not included in such exemptions;* therefore, after the state constitution went into operation, railroad property—if no inviolable contract controlled the matter—was taxable in Minnesota only on the basis fixed in that instrument.

On the twenty-third of June, 1860, there was a foreclosure of two mortgages, (the principal one having been executed July 31st, 1858, and a supplementary one executed November 27th, 1856), which the Minnesota and Pacific Railroad Company, under the authority of an act of the legislature, had given to secure moneys borrowed by it as well as certain bonds it had issued. Those mortgages covered the company's line and all its property and franchises. Their validity is not questioned in this case. The State, being the highest and best bidder at the foreclosure sale, became the purchaser on the twenty-third of June, 1860, and by that purchase, the Supreme Court of Minnesota has said, "the State became vested with all the railroad properties, and, no redemption being made, the company became wholly divested of its rights."

Subsequently, on March 8th, 1861, the Legislature passed an act entitled "An act to facilitate the construction of the Minnesota and Pacific Railroad," which provided "that the road, lands, property, rights, franchises, privileges and immunities belonging or pertaining to the Minnesota and Pacific Railroad Company, prior to the sale and purchase thereof by the Governor on the 23d day of June, 1860, on behalf of the State, and now claimed or held by the State, and all bonds and securities of the said company held by the State, shall be and are hereby released, discharged and restored to the said company free of all liens or claims thereon held by or

in behalf of the State." Section 1. The act named certain conditions to be performed by the company in respect of the proposed railroad, and if they were not performed by the time specified, then all the rights and benefits conferred upon said company "shall be forfeited to the State absolutely without any further act or ceremony whatever." Laws, Minn., 1861, c. 5, p. 235. The company having failed wholly to comply with the conditions prescribed, all the rights, privileges, franchises and immunities granted to it by the last named act were resumed by and reinvested in the State.

Thereafter, by an act of March 10th, 1862, the Legislature, with a view of facilitating the construction of the Minnesota and Pacific Railroad and of amending and continuing the act of incorporation relating thereto, granted to certain named parties under the corporate name of the St. Paul and Pacific Railroad Company "all the rights, privileges, property, franchises, property and interests" granted by the Territory of Minnesota to the Minnesota and Pacific Railroad Company by the above act of May 22d, 1857, "with all the immunities, rights, property, benefits and privileges which the said Minnesota and Pacific Railroad Company had, or might, or could have by reason of the passage of said act, free and clear of all liens thereon, and free from all liens and claims of the State of Minnesota against the same, except such as are retained by the provisions of this act." Special Laws, Minn., 1862, c. 20.

We take from the opinion of the Supreme Court of the State this additional statement of facts, 106 Minnesota, 303, 319: "By Chapter 3, p. 174, Sp. Laws 1864, the St. Paul and Pacific Company was authorized to issue one or more classes of preferred stock and to enter into agreements or contracts with the holders thereof for the administration of the portion of the road to which the stock might pertain; and for the independent organization by such holders to enable them separately or in conjunction with the general directors of the road to exercise supervision and control of their separate portion of the road. Under this act preferred stock was duly issued and

the holders thereof, acting under the statute just referred to, organized and incorporated the First Division of the St. Paul and Pacific Railroad Company, which company, through its officers, thereafter coöperated with the St. Paul and Pacific Company in the construction of the road. The act incorporating the latter named company contained no express reference to the rate or system of taxation to be imposed upon the company, but it is claimed that all the provisions on this subject contained in the old Minnesota and Pacific Company's charter passed by the terms of the act incorporating it and were included within the designation of 'rights, privileges, and immunities.' However, by Chapter 6, p. 40, Sp. Laws 1865, an act to facilitate the completion of the St. Paul and Pacific Railroad and branches, [March 2d, 1865], the Legislature imposed a different rate of taxation than that contained in the Minnesota and Pacific Company's charter, in this, that by this act the company was required to pay during the first three years, after thirty miles of its road had been completed, one per cent of its gross earnings, two per cent during the succeeding seven years, and thereafter three per cent. The act also contained a provision that the lands of the company should be subject to taxation as soon as sold, leased, or contracted to be sold or leased. The St. Paul and Pacific Company formally accepted this act, and the First Division Company thereafter complied with its terms and provisions by paying the rate of taxation thereby imposed. The organization of the First Division Company was legalized and confirmed by Chap. 1, p. 11, Sp. Laws 1866.

"Between 1862 and 1871, both these companies separately executed trust deeds and mortgages covering the main line of the road and all its branches according to the ownership of the same by the separate companies, thereby conveying to the mortgagees or trustees all property, rights, privileges, franchises, and immunities held, owned, or possessed by either company. Both companies made default in the payment of the indebtedness secured by these instruments and they were duly

foreclosed in the manner prescribed by law, John S. Barnes, for himself and associates, being the purchaser at the sale made under the foreclosure as to the branch line. Thereafter Barnes and his associates incorporated under the laws of the State the St. Paul, Minneapolis and Manitoba Railroad Company, and to this company they conveyed all rights acquired under the foreclosure stated. Thereafter the mortgage on the main line was foreclosed and the Manitoba Company became the purchaser. By these foreclosures the Manitoba Company became the sole owner of all rights, privileges, and property of the two other companies. The Manitoba Company leased its line, together with all property rights, franchises, privileges, and immunities to the defendant Great Northern Company, incorporated under the laws of the State for the term of 999 years. The old Pacific and the First Division Companies paid taxes to the State upon the basis of the act of 1865, already referred to, viz., one per cent for the first three years after the completion of thirty miles of road, two per cent for the succeeding seven years, and thereafter, and until their rights passed from them by the foreclosure proceedings, just referred to, at the rate of three per cent of their gross earnings. The Manitoba Company paid this rate at all times during its ownership and operation of the road."

In 1871 the provisions of the state constitution in relation to the taxation of railroad property were extended by an amendment. That amendment was as follows: "Art. 4, sec. 32 (*a*). Any law providing for the repeal or amendment of any law or laws heretofore or hereafter enacted, which provides that any railroad company now existing in this State, or operating its roads therein, or which may be hereafter organized, shall, in lieu of all other taxes and assessments upon their real estate, roads, rolling stock, and other personal property, at and during the time and periods therein specified, pay into the treasury of this State a certain percentage therein mentioned of the gross earnings of such railroad companies now existing or hereafter organized, shall, before the same

shall take effect or be in force, be submitted to a vote of the
people of this State, and be adopted and ratified by a majority
of the electors of the State voting at the election at which
the same shall be submitted to them." This amendment
was submitted to popular vote and approved by the electors.
It thereby became, to all intents and purposes, a part of the
constitution. Const. Minn., Art. 4, § 32a.

After the adoption of that amendment the Legislature
passed the above act of 1903, increasing the tax to be paid
for 1905 and annually thereafter on the *gross earnings of rail-
roads* operated within the State to *four* per cent. That act
was submitted to a vote of the electors and was sustained by
the requisite majority.

As already stated, the railway company insists that the
territorial act of May 22d, 1857, incorporating the Minnesota
and Pacific Railroad Company, constituted a valid and irre-
pealable contract with that company of which its successors
in interest could avail themselves and that its obligation
could not be subsequently impaired by any legislative enact-
ment, or by any provision of the state constitution adopted
in 1858 after the act of 1857 was passed or as amended in 1871.

We have seen that the (old) Minnesota and Pacific Railroad
Company was required, by the territorial act of May 22d,
1857, "in consideration of the grants, privileges and fran-
chises" conferred upon it, to pay annually into the treasury
of the Territory or future State *three* per centum of its gross
earnings for the preceding year, in lieu of all taxes and assess-
ments whatever, and that, "in consideration of such annual
payments," the company should be forever exempt from all
assessments and taxes whatever, territorial, state or munic-
ipal, upon all its stock, by whomsoever held, and upon all
its franchises or estate, real, personal or mixed, and that the
land granted by Congress and conveyed to the company un-
der the authority of the State should be exempt from all tax-
ation until sold and conveyed by it.

The Supreme Court of the State expressed doubt whether

the act of 1857 was so worded as to constitute, in itself, a contract that would prevent the Territory or the State from adopting and enforcing any different rule of taxation from that prescribed by that act. We share this doubt of the state court, that act being alone considered, and we are somewhat justified in so doing by the fact that the state Legislature, by the act of 1865, changed the rate of taxation as to this property, then operated by the St. Paul and Pacific Company (a predecessor of the plaintiff), which had undertaken to complete the contemplated railroad and branches. The act of 1865 seems to have been accepted and complied with by the successors in interest of the Minnesota and Pacific Railroad Company, and amounted, as the court below well said, to a practical construction by the parties of the alleged contract of exemption to be found in the territorial act of 1857. But we forbear any direct decision of this question; for there are other grounds upon which our judgment will be based.

The state court recognized the doctrine as firmly established that a legislature, unless restrained by state constitutional provisions, may contract to limit its power of taxation. But it held that, as taxation was essential to the existence and operations of government, an exemption from taxes cannot be presumed from doubtful language but must be expressed in words so clear and explicit as to leave no reasonable doubt that the exemption was intended to be given. And such is the settled rule announced by this court in cases familiar to counsel and too numerous to be cited. Passing without direct decision the question whether the act of 1857 constituted, in itself, an irrepealable contract as between the Territory and the (old) Minnesota and Pacific Railroad Company, the Supreme Court of Minnesota considered the question whether the contract was personal to that particular company, or "did it become attached as an appurtenant to the charter, rights, franchises, and privileges of the company and pass down the line to the defendant." The first clause of that question was answered by the court in the affirmative: the latter in the

negative—the court citing in support of its conclusions the following cases: *Morgan* v. *Louisiana*, 93 U. S. 217; *Gulf &c. Ry. Co.* v. *Miller*, 114 U. S. 176; *Covington Turnpike Co.* v. *Sanford*, 164 U. S. 578; *City of Rochester* v. *Railway Co.*, 182 N. Y. 99; *Memphis Ry. Co.* v. *Com'rs*, 112 U. S. 609. We need not extend the discussion upon that point.

But the state court said, and correctly, that there was another and stronger reason why it should be adjudged that an irrevocable contract did not and could not pass to the companies that claimed to have succeeded to the rights of the Minnesota and Pacific Railroad Company. That reason is suggested by the facts and circumstances now to be stated by us.

The rights, franchises, privileges or immunities of every kind covered by the above territorial act of 1857 were wholly lost to the old Minnesota and Pacific Railroad Company when the State, by its purchase of June 23d, 1860, at the foreclosure sale, became completely reinvested with them. Those rights, franchises, privileges and immunities were swept away from that company by that sale. Now *when that purchase was made* the Territory had become a State, with a constitution expressly requiring the equal and uniform taxation of *all* real and personal property in the State *upon a cash basis* and authorized the exemption from taxation of certain specified kinds of property, devoted to public and charitable uses; but, as we have seen, *railroad property was not included among the properties that could be so exempted*. It is, therefore, to be taken that the Constitution of the State after it went into operation in 1858, required all railroads to be taxed by an equal and uniform rule and on a cash basis. The State having, by its purchase, become reinvested, in 1860, with all the rights, franchises and privileges granted to the Minnesota and Pacific Railroad in 1857 could, speaking generally, have disposed of such interests at will, but, clearly, it could not have disposed of the interests acquired by its purchase, in any manner that was inconsistent with, or which would have rendered nuga-

tory, the requirements or injunctions of the state constitution. Even if the territorial act of 1857, considered alone, might have been regarded as a contract with the State in respect of the amount of the tax to be paid by the railroad company named in it, that contract ceased to have any force, as against the State, when the State in 1860 became, by purchase at foreclosure sale, the owner of all the rights, property, immunities and franchises of the company. The Legislature of the State could not, *after the state constitution went into operation,* have reinvested the old railroad company with such property, rights, immunities or franchises, or have transferred them to a new corporation or to a consolidated railroad corporation created by the union of prior corporations, *accompanied* by an exemption from taxation that was inconsistent with the constitution. Therefore, when by the act of March 8th, 1861, the State released and restored to the Minnesota and Pacific Railroad Company the road, lands, property, rights, franchises, privileges and immunities which had belonged to that company prior to the State's purchase of 1860, there did not go, there could not have gone, with that release or restoration an exemption from taxation that was forbidden by the state constitution then in operation. That instrument stood in the way of such legislation. And, upon like grounds, it must be held that no qualified or partial exemption from taxation could have been acquired by the St. Paul and Pacific Railroad Company under the act of March, 1862, which assumed to pass to that company all the rights, benefits, privileges, property, franchises and interests of the Minnesota and Pacific Railroad Company, which the State had acquired by its second purchase. It was not competent for the Legislature, *after* the state constitution went into operation, to agree, for the State, that, the payment of any *given per cent of the gross earnings* of the railroad corporation should be in lieu of all other taxation. The constitution again stood in the way.

Apart from the decision of the Supreme Court of Minnesota in this case the views just expressed are abundantly supported

by adjudged cases. It is well to look at some of those cases,
because the question relates to the existence or non-existence
of a contract protected as to its obligation by the Constitu-
tion of the United States; and upon that question this court
must exercise its independent judgment. *Douglas* v. *Kentucky,*
168 U. S. 489, 492, *and authorities there cited.*

In *Trask* v. *Maguire,* 18 Wall. 401, 404, 409, it appeared
that a railroad company was incorporated with an exemption
from state and county taxes. The corporation obtained a
loan from the State. The act under which the loan was made
and the bonds given to secure it, provided that the acceptance
of such bonds should be a mortgage of the road and every part
thereof for the benefit of the State. *Subsequently,* the State
adopted a new constitution, w'ich declared that no property,
real or personal, should be exempt from taxation, except such
as was used exclusively for public schools or belonged to the
United States, and also forbade the Legislature to pass any
special laws exempting the property of any named person or
corporation from taxation. The Legislature passed an act
under which proceedings were instituted against defaulting
railroad companies to foreclose the State's lien. Pending
those proceedings, another act was passed, declaring that
any corporation, purchasing at such a foreclosure sale, should
have the same power, franchises, rights and privileges and be
subject to the same liabilities and restrictions as the corpora-
tion whose property and franchises were to be sold. A sale
was had and the State became the purchaser of the defaulting
railroad and its appurtenances. It was then sold to a private
person, who, with his associates, organized a new corporation
with the same name as the old one. The question was whether
the last corporation was entitled to the immunity from taxa-
tion granted to the origi.al company. This court, speaking
by Mr. Justice Field, said: "When the State became the pur-
chaser *the immunity ceased;* the property stood in its hands
precisely the same as any other unincumbered property of
the State, exempt from taxation, not by virtue of any previous

stipulation with the company, but as all property of the State is thus exempt. Subsequently the road and its appurtenances, and all the franchises, which, under the new constitution of Missouri, adopted in 1865, were transferable by the State, were sold by the commissioners to McKay, Vogel, and Simmons, who conveyed the same to Thomas Allen, who with others, in July, 1867, became incorporated under the name of the St. Louis and Iron Mountain Railroad Company. That company is still in existence, and is one of the defendants herein. To it Allen transferred all the rights and privileges acquired from the State. The act under which the sale was made provided that the purchasers of the road should have all the rights, franchises, privileges, and immunities which were enjoyed by the defaulting company under its charter and laws amendatory thereof, subject to the limitations and conditions therein contained, and not inconsistent with the act authorizing the sale. The new company thus acquired all the immunity from taxation which the original company had possessed, if it were competent for the Legislature *at the time, under the new constitution,* to confer this privilege. The question, therefore, is, whether the Legislature was competent to grant the immunity claimed, under that constitution, which went into operation on the fourth of July, 1865, previous to the passage of any of the acts authorizing the proceedings under which the new company acquired its rights. . . . The inhibition of the constitution applies in all its force *against the renewal of an exemption equally as against its original creation; and this inhibition the Legislature could not disregard in providing for the sale of the property which it had purchased."*

The *Trask* case was cited with approval in *Morgan* v. *Louisiana,* 93 U. S. 217, 224, and *Louisiana & N. R. R. Co.* v. *Palmes,* 109 U. S. 244, 254.

In the latter case it appeared that at a particular date the Legislature of Florida passed an act that was valid under the existing state constitution, which exempted from taxation the capital stock of railroad companies accepting its provi-

sions. The road, property, franchises and privileges under that act were acquired by a certain railroad company; there was a foreclosure and sale under which the road, property and franchises were ultimately acquired by another railroad company, and the Legislature, by an act, declared that the latter company, as assignees of the original company, should have the same exemption as the old company. But *before the above foreclosure a new state constitution came into operation,* which provided for an uniform and equal rate of taxation, and that the property of corporations, whenever created, should be subject to taxation. This court, speaking by Mr. Justice Matthews, said: "It does not weaken this conclusion to say that the exemption contained in the Internal Improvement Act of 1855 was authorized by the Constitution of the State then in force, which may be admitted, and that it was assignable in its nature or by its terms in such manner that it became impressed upon the property itself, into whosesoever hands it should afterwards come. . . . *After the adoption of the Constitution of Florida of* 1868, there could be no corporation created capable in law of accepting and enjoying such an exemption, for that was prohibited by the constitutional provisions that have been cited. In the case of the Pensacola and Louisville Railroad Company, 1872, the capacity at that time to receive this privilege depended altogether upon the Legislative Act amending its charter to that effect; and if any doubt as to this might be reasonably entertained, certainly none can arise as to the Pensacola Railroad Company, which derived all its powers and its very existence 'from legislation dependent for its validity wholly upon the Constitution of 1868. The prohibition which forbids the Legislature from exempting the property of railroad corporations from taxation, makes it impossible for the Legislature to create such a corporation capable in law of acquiring and holding property free from liability to taxation."

In *Memphis Railroad Co.* v. *Commissioners,* 112 U. S. 6Q9, 623, which was a case in which a railroad claimed an exemp-

tion from taxation, enjoyed by its predecessor, this court said: "It is, of course, the law in force *at the time the transaction is consummated and made effectual,* that must be looked to as determining its validity and effect. This is the principle on which this court proceeded in deciding the case of *Railroad Co.* v. *Georgia,* 98 U. S. 359. The franchise *to be a corporation* remained in, and was exercised by, the old corporation, notwithstanding the mortgage of its charter, until the new corporation was formed and organized; it was then surrendered to the State, and by a new grant then made passed to the corporators of the new corporation, and was held and exercised by them under the constitutional restrictions then existing. Our conclusions, then, are, that the exemption from taxation contained in the 28th section of the act of January 11, 1853, was intended to apply only to the Memphis and Little Rock Railroad Company as the original corporation organized under it; that it did not pass by the mortgage of its charter and works, as included in the transfer of the franchise to be a corporation, to the mortgagees or purchasers at the judicial sale; that the franchises embraced in that conveyance were limited to those which had been granted as appropriate to the construction, maintenance, operation, and use of the railroad as a public highway and the right to make profit therefrom; and that the appellant, not having become a corporate body *until after the restrictions in the Constitution of* 1874 *took effect,* was thereby incapable in law of having or enjoying the privilege of holding its property exempt from taxation." That case was referred to with approval in *Mercantile Bank* v. *Tennessee,* 161 U. S. 161, where it was held that a sale of a corporate charter and franchises transferred to the purchaser only the right to reorganize as a corporation, "subject to the laws, constitutional and otherwise, existing at the time of the organization."

A case in point is *Keokuk & Western Railroad Company* v. *Missouri,* 152 U. S. 301, 312. Under the authority of a legislative enactment, passed in 1869, a Missouri corporation was consolidated in 1870 with an Iowa corporation, created in

1857, and the charter of which contained an exemption of its stock from taxation for a specified period. The consolidated road was sold in 1886 under a decree of foreclosure of a mortgage given by the Iowa corporation and conveyed to the Keokuk and Western Railroad Company. The latter company claimed the benefit of the exemption contained in the charter of the company created in 1857. *Between that date and the passage of the act of* 1869 *a new state constitution was adopted,* and it provided that "no property, real or personal, shall be exempt from taxation, except such as may be used exclusively for public schools, and such as may belong to the United States, to this State, to counties, or to municipal corporations within this State." After considering the general question whether an immunity from taxation passed to the purchaser of the franchises, rights, and privileges of a railroad company under a foreclosure of a mortgage, the court said: "But the decisive answer to this objection is that the Legislature had no power, in 1869, to extend to a new corporation created by the consolidation an exemption contained in an act passed in 1857, before the constitution was adopted, and hence that, under the terms of this act, we cannot hold that immunity from taxation passed as a franchise or privilege to the consolidated corporation. The construction claimed by the defendant would be directly in the teeth of the constitutional provision that no property shall be exempted from taxation. While, as heretofore observed, an exemption from taxation contained in a charter previously granted could not be taken away by this constitutional provision without the impairment of the obligation of a contract, *it doubtless applies to all corporations thereafter formed either by original charter or by the consolidation of prior corporations under the act of* 1869."

In *Yazoo & Miss. Valley Ry. Co.* v. *Adams,* 180 U. S. 1, 23, which related to an exemption from taxation claimed by a company consolidated in 1892 by the union of companies organized in 1882, and which consolidation was held to create a new corporation, this court said: "But it is scarcely necessary

to say that, if the consolidation of 1892 resulted in a new corporation, it would come into existence under the constitution of 1890, with the disabilities attaching thereto, among which is the provision that 'the property of all private corporations for pecuniary gain shall be taxed in the same way and to the same extent as the property of individuals.' Even if the Legislature, in these several acts of consolidation, had expressly provided that the new corporation thereby formed should be exempted from taxation, the higher law of the constitution would be interpreted as nullifying it to that extent. A similar remark may be made with regard to the provision that these companies might consolidate upon such terms as they should agree upon. Obviously such terms must be consistent with the law existing *at the time of the consolidation.* . . . Under no circumstances would they be interpreted as conveying rights to the new corporation which the Legislature was incompetent to confer."

In *Rochester Ry. Co.* v. *Rochester,* 205 U. S. 236, 254, 255, it was held, in respect to a legislative enactment assuming to transfer to a particular corporation an exemption granted to a former corporation, the court, after a full reference to the adjudged cases, held: "No corporation can receive by transfer from another an exemption from taxation or governmental regulation which is inconsistent with its own charter *or* with the constitution or laws of the State then applicable, and this is true, even though, under legislative authority, the exemption is transferred by words which clearly include it;" that "those who seek and obtain the benefit of a charter of incorporation must take the benefit under the conditions and with the burdens prescribed by the laws *then in force,* whether in the constitution, in general laws or in the charter itself."

The recent case of *Yazoo & Miss. Valley R. R. Co.* v. *Vicksburg,* 209 U. S. 358, 364, 365, was the case of a consolidated corporation claiming the benefit of an exemption legally given to its predecessor before the adoption of a state constitution prohibiting the exemption of corporate property

from taxation. This court said: "The exemption to the former constituent company could not inure to the consolidated company without, in effect, ignoring the constitutional provision. . . . . The formation of the consolidated company was not imposed upon the complainant; it had the privilege of standing upon such rights as it had by contract or otherwise under the former legislation in force before the adoption of the new constitution. When it saw fit to enter into the consolidation and form a new corporation in 1892 the constitution *then in force* in the State became the law of its corporate being, and the requirement that corporate property should not be exempt from taxation then became binding upon it, as upon all other corporations formed under the new organic law."

In view of the adjudged cases it would seem clear that after the Minnesota constitution went into operation in 1858 the Legislature could not, by legislation or otherwise, enter into a binding contract for a complete or partial exemption, either in favor of the corporation originally created by the Territory in 1857, or in favor of a new railroad corporation or of one created by the consolidation of old corporations. It must have been controlled by the fundamental law of the State. So the highest court of Minnesota has held in this case. And so we hold. It follows that legislative acts, relating to the property and railroads here in question, and passed after the state constitution took effect, which proceeded, in the matter of taxation on grounds of taxation different from those established by that instrument, were ineffectual.

We have not deemed it necessary in this discussion to refer in detail to the numerous cases in the Supreme Court of the State which have been cited by counsel. This course has been pursued for two reasons: 1. The state court, in its opinion in the present case, said: "That the question here presented, viz., whether the provisions of the Minnesota and Pacific Company's charter on the subject of the earnings tax constituted an irrevocable contract was not involved in any prior litigation be-

tween the State and the railroad company, and as what was said in the previous cases bearing upon the question was wholly unnecessary to the decision of the particular case, and therefore not of binding force or effect, we take up and dispose of the present case as though the question were, as it is, here for the first time." We accept that view of the state court as to the scope of its own decisions.  2. The question just stated—the question of the existence or non-existence of a binding contract with the State—is one peculiarly for the final determination of this court.  The authorities heretofore cited by us show that upon an issue of that kind this court must, upon its own responsibility and independent judgment, determine the legal rights of the parties under the clause of the Federal Constitution protecting the obligation of contracts against being impaired by state legislation.

In the present case it is gratifying that there is a concurrence of views between this court and the state court upon the question whether the plaintiff in error, the Great Northern Railway Company, described by the state court as the "successor in interest of all the prior companies," was entitled, as upon contract, to claim the benefit of the three per centum gross earnings tax provision in the act of 1857.  And this seems to be a determination of the only question of a Federal nature arising on this writ of error and which should be now decided; for, if the contention of the railroad company as to that question be overruled—as both this court and the state court agree that it must be—it would only remain to inquire whether the act of 1903, prescribing a four per centum gross earnings tax, was authorized by the state constitution, as amended in 1871.  The Supreme Court of the State adjudges that it was so authorized, but that is a state or local question upon which this court need not express its opinion.  It is true that one of the assignments of error before the state court was that the act of 1903 was inconsistent with the due process clause of the Federal Constitution.  But the suggestion was not much pressed in argument; and it cannot, under the evi-

dence before us in this case, be assumed that the rate pre-
scribed by the act of 1903 is confiscatory either in its nature
or in its necessary operation. If, when the act of 1903 was
passed, the State was not fettered by inviolable contracts in
respect of the taxation of the gross earnings of railroad prop-
erty, there was nothing to prevent the Legislature, instructed
by a popular vote, from prescribing an uniform gross earnings
tax for all railroad property operated in the State. There
being no adequate proof showing the contrary, the rate pre-
scribed by that act must be taken as being within the power
of the Legislature to establish and not as being confiscatory.
There is absolutely nothing in the record that would justify
the conclusion that the rate fixed by the act of 1903 was con-
fiscatory in its nature, that is, wanting in the due process of
law enjoined by the Constitution.

One other matter deserves notice. Some reference was
made at the argument to *Stearns* v. *Minnesota*, 179 U. S. 223,
230, 240, 253. There is nothing in the judgment in that case
which at all conflicts with or controls the decision in this case.
That case involved only the question whether certain *lands*
owned by the defendant railroad companies, but which were
not used in the operation of their roads in the State, were
subject to taxation according to their value or were exempted
from ordinary rule of taxation by virtue of statutes, like that
of 1857, passed after the state constitution took effect. A
similar question was adverted to in the present case and the
state Supreme Court, referring to the charter of the Minnesota
and Pacific Railroad Company, said: "Two distinct provi-
sions on the subject of taxation were embodied therein, the
first providing for a gross earnings tax in lieu of all other taxes
and assessments, and second, an exemption of the *land*
granted until sold or contracted to be sold by the company."
Observing that the exemption in question did not pass as an
appurtenant to the railroad properties in question and was
not included within the expression 'rights, privileges, and
immunities'—citing *Gulf &c. Ry. Co.* v. *Hewes*, 183 U. S. 66;

*C. & O. Ry. Co.* v. *Miller,* 114 U. S. 176; *Lake* v. *Drummond,* 49 S. E. Rep. 506; *Rochester* v. *Ry. Co.,* 182 N. Y. 99; *Covington Turnpike Co.* v. *Sandford,* 164 U. S. 578—the court said: "A distinction must not be overlooked when considering the assignability of a tax exemption between those imposing a commuted system in lieu of property taxes, and those exempting specific property. In the former case the system does not attach to the corporation or concern thus taxed nor to any particular property, and necessarily is personal and not assignable. But where, as in the case at bar, specific land, granted to a railroad company to aid in the construction of a railroad company, is specifically exempted from taxation until sold by the company, and the company accepts, in consideration of the exemption, the exemption attaches to and follows the land. *New Jersey* v. *Wilson,* 7 Cranch, 164; *State* v. *Hicks,* 30 Am. Dec. 423; *Ry. Co.* v. *State,* 75 Texas, 356. In such case, as we have frequently held, as will be shown later, the exemption is appurtenant to and passes with the land to a succeeding corporation assuming the burden attached to it." In the *Stearns case* the court determined only the question whether the *lands* of the railroad company were taxable. It held, upon the showing there made, that there was a valid contract with the railroad companies in respect to the taxation of the lands there in question which it was beyond the power of the State to impair by legislation. Nothing beyond that was actually adjudged in the *Stearns case.* No such question arises in the present case. There is no attempt here to tax the *lands* granted by the territorial act of 1857 or by any other act.

The State sues only for the balance due to it on account of taxes imposed by the act of 1903 on the *gross earnings* of property used and operated within its limits for railroad purposes.

Perceiving no error in the record as to the Federal question involved, the judgment must be affirmed.

*It is so ordered.*