**The STATE of Minnesota, by Hubert H. HUMPHREY, III, its then Attorney General, Appellant,**

**Blue Cross and Blue Shield of Minnesota, Plaintiff,**

v.

**PHILIP MORRIS USA, INC., Respondent,**

**R.J. Reynolds Tobacco Company, et al., Respondents,**

**Brown & Williamson Tobacco Corporation, et al., Defendants,**

**A.H. Hermel Candy & Tobacco Co., et al., intervenors, Respondents,**

**Council of Independent Tobacco Manufacturers of America, intervenor, Respondent,**

**Commonwealth Brands, Inc., intervenor, Respondent.**

No. A05–2540.

Supreme Court of Minnesota.

May 16, 2006.

Mike Hatch, Attorney General, Bradford S. Delapena, Assistant Attorney General, Michael J. Vanselow, Deputy Attorney General, St. Paul, MN, for Appellant.

Peter W. Sipkins, Edward B. Magarian, Dorsey & Whitney L.L.P., and David F. Herr, Mary R. Vasaly, Maslon Edeman, Borman & Brand L.L.P., Minneapolis, MN; and Murray Garnick, Geoffrey J. Michael, Arnold & Porter L.L.P., Washington, DC; and Anand Agneshwar, Arnold & Porter L.L.P., New York, NY, for Respondent Philip Morris USA, Inc.

Walter A. Pickhardt, Daniel J. Connolly, Faegre & Benson L.L.P., Minneapolis, MN, for Respondent R.J. Reynolds Tobacco Company and Respondent Lorillard Tobacco Company, Inc.

Andrew J. Haile, Brooks, Pierce, McLendon, Humphrey & Leonard L.L.P., Greensboro, NC, for Respondent Lorillard Tobacco Company.

Stephen R. Patton, Elli Leibenstein, Jonathan E. Moore, Kirkland & Ellis L.L.P., Chicago, IL, for Respondent R.J. Reynolds Tobacco Company.

Randy G. Gullickson, Janel M. Dressen, Anthony Ostlund & Baer P.A., Minneapolis, MN, for Respondent A.H. Hermel Candy & Tobacco Co.

Thomas H. Boyd, Karl E. Robinson, Winthrop & Weinstine P.A., Minneapolis, MN, for Respondent Counsel of Independent Tobacco Manufacturers of America.

Brent R. Lindahl, Scott G. Knudson, Briggs and Morgan P.A., Minneapolis, MN; and Robert J. Brookhiser, Elizabeth B. McCallum, Howrey L.L.P., Washington, DC, for Respondent Commonwealth Brands, Inc.

Karen A. Janisch, General Counsel to the Governor, St. Paul, MN, for Amicus Governor.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

We are asked to determine whether the appellant State of Minnesota can

impose a 75–cent Health Impact Fee on the cigarettes of manufacturers that are parties to the 1998 settlement of the state's tobacco suit, *State by Humphrey v. Philip Morris USA, Inc.*, 2005 WL 3478647, No. C1–94–8565 (Minn.Dist.Ct. Dec. 20, 2005). Respondents Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company, Inc., challenge the imposition of the fee on their products. The Ramsey County District Court concluded that the Health Impact Fee violates the settlement agreement and is unconstitutional. The district court also concluded that if the Health Impact Fee cannot be imposed on respondents' products, continued imposition of the Health Impact Fee on the products of the intervenors, a cigarette manufacturer and an industry trade association of cigarette manufacturers that are not parties to the settlement agreement, would constitute selective enforcement and violate those intervenors' right to equal protection. We granted accelerated review and now reverse the district court. We conclude that the imposition of the Health Impact Fee does not violate the settlement agreement because the terms of the settlement agreement do not unmistakably relinquish the state legislature's sovereign authority to impose such an exaction on tobacco products in order to recover health care costs related to the use of tobacco products and to discourage smoking.

In 1994, the state and co-plaintiff Blue Cross and Blue Shield of Minnesota sued certain major cigarette manufacturers and trade organizations, asserting claims for monetary, equitable, and injunctive relief. The state settled with one of the defendant manufacturers, Liggett Group, Inc., in 1997, and in May 1998 settled with the remaining defendants (settlement agreement). The terms of the settlement agreement required the manufacturers to make six payments to the state of specified amounts through January 2003, as well as additional annual payments to the state beginning on December 31, 1998, and continuing in perpetuity. The settlement agreement provided that each of the payments to the state were in satisfaction of the state's claim for damages incurred in the year of such payment or earlier years "relat[ing] to the subject matter of this action." The settlement agreement also included mutual releases and a covenant not to sue by the state. In addition, the terms of the settlement required the settling manufacturers to restrict their advertising, lobbying, and litigation activities. The Ramsey County District Court retained jurisdiction to enforce the settlement agreement.

In July 2005, the legislature enacted legislation imposing a "Health Impact Fee" of 75 cents on each pack of cigarettes sold in Minnesota after July 31, 2005. Act of July 14, 2005, ch. 4, art. 4, § 2, 2005 Minn. Laws 1st Spec. Sess. 2454, 2541–42 (codified at Minn.Stat. § 256.9658 (Supp.2005)). The legislature expressly stated that the purposes of the Health Impact Fee were "to recover for the state health costs related to or caused by tobacco use and to reduce tobacco use, particularly by youths." Minn.Stat. § 256.9658, subd. 1. The Health Impact Fee "is imposed on and collected from" cigarette distributors. *Id.* Cigarette distributors pay the fee "at the same time and in the same manner" as they pay cigarette taxes under Minn.Stat. ch. 297F (2004 & Supp.2005), that is, by purchase of a tax stamp that must be affixed to each pack of cigarettes. Minn. Stat. § 256.9658, subds. 4, 7. In the same legislation, the legislature amended the Unfair Cigarette Sales Act to specifically include "fees," such as the Health Impact Fee, in the definition of the "basic cost of cigarettes." Act of July 14, 2005, ch. 4,

art. 4, § 4, 2005 Minn. Laws 1st Spec. Sess. at 2543 (codified as amended at Minn.Stat. § 325D.32, subd. 9 (Supp. 2005)); *see* Minn.Stat. § 325D.31 (2004).

Finally, the legislation also created a Health Impact Fund in the state treasury, to which revenue from the Health Impact Fee is credited. Act of July 14, 2005, ch. 4, art. 4, § 1, 2005 Minn. Laws 1st Spec. Sess. at 2541 (codified at Minn.Stat. § 16A.725 (Supp.2005)). The Commissioner of Human Services is required to certify annually the health care costs incurred by the state for the previous fiscal year attributable to tobacco use, and the Commissioner of Finance must transfer funds from the Health Impact Fund to the general fund to offset those certified health care expenditures. Minn.Stat. § 16A.725, subds. 2, 3(a).

In August 2005, Philip Morris USA, R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company (collectively the "settling manufacturers") and their distributors[1] filed motions in Ramsey County District Court under the caption of the 1994 tobacco case seeking to enforce the terms of the settlement agreement and to prevent the imposition of the Health Impact Fee on their products. The respondents alleged that the state's release in the settlement agreement "serves as a complete bar and defense to any attempt by the State to collect the [Health Impact Fee] with respect" to their products. Commonwealth Brands, Inc., a cigarette manufacturer that was not a party to the state's

tobacco litigation, intervened, as did the Council of Independent Tobacco Manufacturers of America, whose cigarette manufacturer members also were not parties to the state's tobacco litigation. The intervenors alleged that, if the court ruled the Health Impact Fee could not be imposed on the products of the settling manufacturers, it could not be imposed on the intervenors' products[2] without violating the intervenors' rights under the First Amendment and the Equal Protection Clause of the U.S. Constitution, as well as the Uniformity Clause of the state constitution. Governor Tim Pawlenty, by his counsel, participated as an amicus curiae.

By order dated December 20, 2005, the Ramsey County District Court granted the respondents' motion to enforce the settlement agreement, ordering that "the Health Impact Fee violates the Settlement Agreement and is unconstitutional." The court noted that the "essential benefits" of the settlement agreement to respondents were that it "reduced to liquidated form, those damages which the state sought to collect by its lawsuit." The court also noted that by enacting the Health Impact Fee the legislature sought "to recover those costs from the settling defendants which are prohibited by the settlement agreement." The court stated that by seeking reimbursement of tobacco-related health care costs the state had violated the settlement agreement.

---

**1.** The following distributors of the settling manufacturers' products are also respondents in this appeal: A.H. Hermel Candy & Tobacco Co.; Henry's Foods, Inc.; Sandstrom's Inc.; Johnson Candy and Tobacco Co. of Brainerd, Inc.; M. Amundson Cigar & Candy Company L.L.P.; The Watson Companies, Inc.; Granite City Jobbing Company, Inc.; Minter–Weisman Co.; Segal Wholesale, Inc.; and Tyler Wholesale, Inc.

Unless otherwise qualified, references in this opinion to respondents mean the settling manufacturers and these distributors.

**2.** Although intervenor Council of Independent Tobacco Manufacturers of America manufactures no products, its members do. For ease of reference, we will refer to the products of those member manufacturers and of intervenor Commonwealth Brands as intervenors' products.

The district court also granted the intervenors' motion to bar the imposition of the Health Impact Fee on their products, ordering that "the Health Impact Fee cannot be enforced against [the intervenors] because it constitutes a selective enforcement and deprives them of equal protection under the law." Having barred the imposition of the Health Impact Fee on the products of the settling manufacturers, the court noted that imposing the Health Impact Fee on other cigarettes would give the settling manufacturers' products "a distinct marketplace advantage in price" that would only encourage underage smokers to switch to those products, rather than to quit altogether. As a result, the district court stated, the purposes of the legislation—to recover tobacco-related health care costs and discourage smoking—would not be met if the Health Impact Fee were imposed on only some cigarettes.

Finally, the district court ordered that "[t]he defendants and the intervenors are [entitled] to credit or refunds, to the extent paid." The court stayed its order pending appeal, and the state continues to collect the Health Impact Fee. However, the state must keep any funds collected in the Health Impact Fund until all appeals are exhausted and the district court has determined how those funds will be disbursed.

By order dated January 19, 2006, we granted the state's petition for accelerated review and set an expedited schedule for briefing and oral argument.

### I.

■ Because the facts are undisputed, the only issues before us on appeal from the district court's order enforcing the settlement agreement are questions of contractual, statutory, and constitutional interpretation. These are legal issues subject to de novo review. *See, e.g., Employers Mut. Cas. Co. v. A.C.C.T., Inc.,* 580 N.W.2d 490, 493 (Minn.1998) (contract interpretation); *Vlahos v. R & I Constr. of Bloomington, Inc.,* 676 N.W.2d 672, 679 (Minn.2004) (statutory interpretation); *State v. Brooks,* 604 N.W.2d 345, 348 (Minn.2000) (constitutional interpretation).

■ We consider the settlement agreement as a contract. *Ryan v. Ryan,* 292 Minn. 52, 55, 193 N.W.2d 295, 297 (1971). Unambiguous language in the settlement agreement is to be given its plain and ordinary meaning. *See Minneapolis Pub. Hous. Auth. v. Lor,* 591 N.W.2d 700, 704 (Minn.1999). In construing ambiguous contract language, we consider the contract as a whole in light of the circumstances surrounding its formation, and strive to arrive at the parties' real understanding. *See Donnay v. Boulware,* 275 Minn. 37, 43, 144 N.W.2d 711, 715 (1966).

■ Respondents and intervenors also urge us to declare the Health Impact Fee unconstitutional. We will uphold a statute unless the challenging party demonstrates that it is unconstitutional beyond a reasonable doubt, and every presumption is invoked in favor of the constitutionality of a statute. *E.g., Hutchinson Tech., Inc. v. Comm'r of Revenue,* 698 N.W.2d 1, 14 (Minn.2005). Moreover, we do not reach constitutional issues if the matter can be resolved otherwise. *In re Senty–Haugen,* 583 N.W.2d 266, 269 n. 3 (Minn.1998) (citing *Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). Accordingly, we first evaluate the parties' arguments as to the construction of the settlement agreement.

### II.

There is no dispute that in the settlement agreement the state agreed to re-

lease respondents from a range of potential future claims in return for the required settlement payments and restrictions on future conduct. We must decide whether any obligations created by the Health Impact Fee legislation are within the scope of those released. To do this, we first examine the nature of the obligations the Health Impact Fee legislation imposed on respondents. Second, we look to the settlement agreement to determine, as a matter of contract interpretation, whether Health Impact Fee obligations are among those the state released.

### A.

We first consider what obligations, if any, the enactment of the Health Impact Fee imposed on respondents. As we have noted, Minn.Stat. § 256.9658 imposes a Health Impact Fee of 75 cents on each pack of cigarettes sold in Minnesota after July 31, 2005. See Act of July 14, 2005, ch. 4, art. 4, § 2, 2005 Minn. Laws 1st Spec. Sess. at 2541–42. Minnesota Statutes § 256.9658, subd. 4, requires that cigarette distributors pay the Health Impact Fee to the state "at the same time and in the same manner as provided for payment of tax under chapter 297F." Minnesota Statutes §§ 297F.08–.09 (2004 & Supp.2005), in turn, require that cigarette distributors remit cigarette taxes and fees to the state by purchasing tax stamps, which are then affixed to each pack of cigarettes sold in the state.

■ The Minnesota Unfair Cigarette Sales Act, Minn.Stat. §§ 325D.30–.42 (2004 & Supp.2005), establishes a minimum price (called the "basic cost") for cigarettes. As amended by the Health Impact Fee legislation, that minimum price includes all taxes and fees imposed by the state, including the Health Impact Fee. See Minn.Stat. § 325D.32, subd. 9 (Supp. 2005). Further, the Unfair Cigarette Sales Act requires both distributors and retailers to charge at least the "basic cost" (plus a statutorily-presumed cost of doing business markup) for the cigarettes they sell. Minn.Stat. § 325D.33, subd. 1 (2004) (prohibiting wholesalers and retailers from selling cigarettes at less than their respective costs); Minn.Stat. § 325D.32, subds. 10, 11 (2004) (defining "cost to wholesaler" and "cost of the retailer" to mean the "basic cost" of cigarettes plus their respective "cost of doing business"). Thus, distributors are required by law to pass the Health Impact Fee through to cigarette retailers, and retailers are required to pass the Health Impact Fee through to retail cigarette purchasers. As a result, Minnesota law requires that retail cigarette purchasers, not cigarette manufacturers or distributors, bear the economic burden of the Health Impact Fee.

In enacting the Health Impact Fee and thereby increasing the cost of a tax stamp, the legislature did create an obligation on the part of cigarette distributors, to remit the fee to the state through their purchase of tax stamps. Therefore, the district court correctly stated that the Health Impact Fee is "collected from the distributors of tobacco products." But the distributors ultimately bear no economic burden from the imposition of the Health Impact Fee because it must be passed on to retail purchasers, including a markup for the distributors' cost of doing business. On the other hand, the legislation imposed no liabilities, obligations, or claims on cigarette manufacturers for the Health Impact Fee. The only impact of passage of the Health Impact Fee on the manufacturers is that others, ultimately consumers, are required to pay the fee when the manufacturers' products are sold.

Thus, while one of the express purposes of the Health Impact Fee legislation was to recover tobacco-related health care

costs for the state, those costs are not recovered from respondents. The law requires retail cigarette consumers to bear the cost of the Health Impact Fee, and it is therefore those consumers who in fact reimburse the state for health care costs associated with tobacco use.

## B.

We next address whether the obligations imposed by the enactment of the Health Impact Fee are within the scope of the release agreed to by the state in the settlement agreement. In doing so, it is helpful to consider a more complete presentation of the language of the state's release, rather than partial excerpts:

> *State of Minnesota's Release and Discharge.* Upon Final Approval, the State of Minnesota shall release and forever discharge all Defendants [and specified related entities, including distributors] from any and all manner of civil claims, demands, actions, suits and causes of action, damages whenever incurred, liabilities of any nature whatsoever, including civil penalties, as well as costs, expenses and attorneys' fees, known or unknown, suspected or unsuspected, accrued or unaccrued, whether legal, equitable or statutory ("Claims") that the State of Minnesota [and its related entities] whether directly, indirectly, representatively, derivatively or in any other capacity, ever had, now has or hereafter can, shall or may have, as follows:
>
> a. for past conduct, as to any Claims relating to the subject matter of this action which have been asserted or could be asserted now or in the future in this action or a comparable Federal action by the State; and
>
> b. for future conduct, only as to monetary Claims directly or indirectly based on, arising out of or in any way related to, in whole or in part, the use

of or exposure to Tobacco Products manufactured in the ordinary course of business, including without limitation any future claims for reimbursement for health care costs allegedly associated with use of or exposure to Tobacco Products.

Despite the fact that respondents are not obligated to pay the Health Impact Fee themselves, they argue that the imposition of the fee violates the settlement agreement. In doing so, respondents do not acknowledge the specific and limited obligations placed upon them by the Health Impact Fee legislation, but focus on the legislation's purpose, to recover tobacco-related health care costs, regardless of who pays. Therefore, we begin our analysis with the nature of the claims, as respondents construe them, that respondents contend the state released and that respondents contend are improperly revived by the Health Impact Fee legislation.

Respondents argue that the terms of the settlement agreement create "a broad, comprehensive 'Release and Discharge' of all claims by the State—past, present, and future—for reimbursement of health care costs attributable to tobacco." Respondents assert that this broad release of all claims for recovery of health care costs was the "only tangible benefit" they received under the settlement agreement. Although respondents do not articulate the boundaries of this release with specificity, there appear to be two important characteristics of the release as construed by respondents.

First, as noted above, in respondents' view the state's broad release of claims for reimbursement of health care costs is not limited to reimbursement by respondents. For if the release is limited to reimbursement *by respondents* for health care costs, the Health Impact Fee would not fall with-

in the release at all, because the manufacturers are not required to pay any part of the fee and their distributors are reimbursed for their initial payment of the fee through retail sales.

Second, respondents contend that the release of claims for reimbursement of health care costs extends beyond claims that may be brought in litigation to actions by the legislature to recover those costs. Respondents state that a general excise tax on tobacco products would not be subject to the release, even if its proceeds were used to pay for tobacco-related health care costs. But they argue that a legislative revenue measure that is expressly intended to recover health care costs *would* fall within the scope of the released claims. The distinction, apparently, is the legislation's express focus on recovery of health care costs.

In positing this release of all claims for reimbursement of health care costs, respondents rely on both the broad language of the release that relieves them of "liabilities of any nature whatsoever, * * * whether legal, equitable or statutory," and on the specific reference in subparagraph b of the release to "any future claims for reimbursement for health care costs allegedly associated with use of or exposure to Tobacco Products." They also point to the provision earlier in the settlement agreement that each annual payment is "in satisfaction of all of the State of Minnesota's claims for damages incurred by the State in the year of such payment or earlier years * * * including, without limitation * * * claims for [tobacco-related] health care expenditures." Moreover, because the release includes "statutory" claims, respondents assert, it necessarily includes revenue measures enacted by the legislature.

Thus, again, respondents' contention is that in the settlement agreement the state released all claims for future recovery of tobacco-related health care costs, including revenue measures enacted by the legislature if they are expressly intended to recover those costs. Because the Health Impact Fee is expressly aimed at recovering tobacco-related health care costs, respondents conclude, it cannot be enforced against them, or, apparently, their products.

The district court similarly focused on recovery of health care costs. It concluded that the imposition of the Health Impact Fee "seeks to recover those costs from the settling defendants which are prohibited by the settlement agreement." Although like respondents' argument the district court's memorandum is also lacking in some specificity, by "those costs," we assume the court meant "state health costs related to or caused by tobacco use," referenced in the court's preceding paragraph. In fact, the essence of the court's conclusion that the imposition of the Health Impact Fee violates the settlement agreement seems to be that the purpose of the Health Impact Fee legislation "was to seek government reimbursement for the costs associated with tobacco," because the court stated "[t]hat the state sought reimbursement of tobacco-related health care costs clearly violates the Settlement Agreement."

The state counters that the settlement agreement was not intended, as respondents insist, to restrict future legislative acts. According to the state, the purpose of the settlement agreement was to resolve only adjudicatory claims, such as those asserted by the state in its lawsuit. Arguing that the state participated in the settlement agreement only in its proprietary, rather than its sovereign, capacity, the state contends that the release of future claims based on respondents' future conduct meant only that the state released claims, obligations, or liabilities it could

attempt to establish through future litigation, including any claims for recovery of tobacco-related health care costs. In other words, the state says it gave up the right to sue respondents in the future to recover damages, including health care costs, from future wrongful conduct of respondents. The reference to "statutory" claims or liabilities in the release, the state asserts, was to legislatively-created claims for relief that it could assert in future lawsuits, such as consumer fraud actions. The state contends the settlement agreement did not, and could not, release respondents from future regulation by the legislature, including future financial obligations the legislature might impose on the tobacco industry generally.[3]

The state argues further that if the settlement agreement were construed broadly to bar future legislative action that imposes financial obligations on respondents' products merely because the proceeds are earmarked for payment of future health care costs, the agreement would constitute a surrender of sovereign legislative authority, particularly the taxing and police powers.[4] The state contends that under the "unmistakability doctrine," a contract cannot be construed to waive or surrender a sovereign power of the state unless the contract does so in unmistakable language,

which, the state further asserts, is not to be found in the settlement agreement.

■ As explained in more detail below, we conclude that to construe the settlement agreement as respondents urge, that is, to waive the legislature's authority to enact revenue measures to recover tobacco-related health care costs, would be a surrender of the legislature's sovereign power. As a result, the unmistakability doctrine applies and requires that we not so construe the settlement agreement unless it surrenders sovereign power in unmistakable terms. We do not find the requisite unequivocal language in the settlement agreement, and therefore conclude that the Health Impact Fee legislation does not violate the terms of the agreement.

■ The unmistakability doctrine is a rule of contract construction that provides the sovereign powers of a state cannot be contracted away except in "unmistakable" terms. The United States Supreme Court's recent explanation of the historical underpinnings of the unmistakability doctrine is helpful in appreciating the purposes and application of the doctrine. *See United States v. Winstar Corp.*, 518 U.S. 839, 871–79, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion). The plurality in *Winstar* explained that the unmistak-

---

**3.** The state also contests respondents' assertion that the only tangible value of the settlement was a broad release of claims for future smoking-related health care costs. Rather, the state argues, significant other benefits inured to respondents, even under a more narrow reading of the release. For example, respondent manufacturers were relieved of the uncertainty of a possible adverse verdict, which could have resulted in awards of compensatory and punitive damages greater than the agreed-to settlement amounts and which could potentially have been used against respondent manufacturers in similar litigation then pending around the country. Additionally, the state asserts the release of future

claims freed respondent manufacturers from the potential of further litigation seeking to recover future damages, including, but not limited to, future health care costs. We agree that these benefits of the settlement agreement are both tangible and significant.

**4.** The parties disagree whether the Health Impact Fee is a tax or a fee. We need not resolve that dispute because, whether the Health Impact Fee is a tax enacted under the taxing power or a regulatory fee enacted under the police power, it is undisputedly an exercise of a sovereign power of the legislature.

ability doctrine was developed in early cases applying the Contract Clause of the U.S. Constitution to state contracts. *Winstar*, 518 U.S. at 874, 116 S.Ct. 2432. "Although that Clause made it possible for state legislatures to bind their successors by entering into contracts, it soon became apparent that such contracts could become a threat to the sovereign responsibilities of state governments." *Id.* As the *Winstar* plurality explained, two limitations developed to protect state regulatory powers: the "reserved powers" doctrine, under which certain sovereign powers of the state could not be contracted away, and the "unmistakability" doctrine, a canon of construction under which "neither the right of taxation, nor any other power of sovereignty, will be held * * * to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken." *Id.* at 874–75, 116 S.Ct. 2432 (citation and internal quotation marks omitted). Summarizing recent applications of the unmistakability doctrine, the plurality explained that neither silence nor ambiguous terms in a contract will be construed as effecting a waiver of sovereign authority. *Id.* at 878, 116 S.Ct. 2432 ("[A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act * * *, nor will an ambiguous term of a * * * contract be construed as a conveyance or surrender of sovereign power."); *see also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986).

Although not using the phrase "unmistakability doctrine," we explained the same principles as early as 1908. In *State v. Great Northern Railway Co.*, a railroad challenged legislation increasing the rate of taxation on it on the basis that the railroad had been guaranteed a lower tax rate by the railroad's state charter. 106 Minn. 303, 317–19, 119 N.W. 202, 203–05 (1908), *aff'd*, 216 U.S. 206, 30 S.Ct. 344, 54 L.Ed. 446 (1910). Although at the time the charter had been granted the legislature was free to limit its power of taxation by contract, we explained that the power of taxation was a sovereign prerogative and therefore a contractual limitation on that power should not be found based on inferences or ambiguous language. *See id.* at 322, 119 N.W. at 205. Rather, a contract purporting to limit the state's right to tax in the future "is to be strictly construed, and must be in language and terms too clear to admit of doubt." *Id.* at 322–23, 119 N.W. at 205 (citing *Chicago, Burlington & Kan. City R.R. v. Guffey*, 120 U.S. 569, 7 S.Ct. 693, 30 L.Ed. 732 (1887)).

Respondents argue that the unmistakability doctrine does not apply here because the settlement agreement infringed neither the taxation power nor the police power. Instead, respondents argue that in the settlement agreement the state simply assumed the risk that "it would not be able to impose new liabilities for the State's smoking-attributable health care costs beyond the liability created by the Settlement Agreement." Respondents contend such "risk-shifting" does not affect sovereign powers and does not, therefore, trigger the unmistakability doctrine. Respondents rely on the plurality opinion in *Winstar*, 518 U.S. at 880, 116 S.Ct. 2432, for this risk-shifting argument. But respondents' argument misapplies the concept discussed in that case.

The plurality in *Winstar* explained that the application of the unmistakability doctrine differs according to the type of obligations assumed by the government and

the consequences of enforcing them.[5] 518 U.S. at 880, 116 S.Ct. 2432. At one end of the spectrum are obligations to which the unmistakability doctrine always applies, that is, "claims for enforcement of contractual obligations that could not be recognized without effectively limiting sovereign authority," such as a claim for a tax rebate based on an agreement for a tax exemption. *Id.* Because granting a tax rebate would essentially negate the exercise of the taxing power, the unmistakability doctrine would have to be satisfied, according to the plurality. *Id.* At the other end of the spectrum are ordinary contracts, such as "humdrum supply contracts," where sovereign power is not compromised by enforcement of the promise made, and the unmistakability doctrine therefore never applies. *Id.* In between these poles, the plurality stated, there are an "enormous variety" of contracts under which performance may or may not involve the exercise or the forbearance of a sovereign power. *Id.* As to these contracts, the plurality said:

> So long as such a contract is reasonably construed to include a risk-shifting component *that may be enforced without effectively barring the exercise of that [sovereign] power,* the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it.

*Id.* (emphasis added).

Applying these principles in *Winstar,* the plurality found the unmistakability doctrine inapplicable because the plaintiffs did not claim the contracts, which promised application of a specific regulatory accounting practice to them, barred enforcement of changed regulatory requirements adopted by the government agency. *See id.* at 881, 887, 116 S.Ct. 2432. Rather, the plaintiffs asserted only that the government was required to pay damages as a result of its failure to maintain the previous regulatory structure as to plaintiffs, as it had promised. *Id.* at 871, 116 S.Ct. 2432. Moreover, the damages sought by the plaintiffs would not effectively negate the exercise of sovereign power in changing the regulatory requirements by depriving the government of money it would otherwise have been entitled to receive, as would a tax rebate. *See id.* at 882–83, 116 S.Ct. 2432.

Here, in asserting that the settlement agreement resulted only in risk-shifting, respondents explain that risk-shifting as follows: "[T]he State assumed the risk that future legislation would create additional 'liabilities of any nature whatsoever' that would fall within the Release *and thus be unenforceable* as to the Settling Defendants' products." (Emphasis added.) Thus, in contrast to the plaintiffs in *Winstar,* respondents argue that the consequence of the promise made by the state is that the exercise of sovereign power by the legislature is *unenforceable* as to them and their products. In other words, respondents do not posit a "risk-shifting component that may be enforced without effectively barring the exercise of that [sovereign] power." *Winstar,* 518 U.S. at 880, 116 S.Ct. 2432. Rather, the very relief respondents seek requires the state either to exempt respondents from the exercise of the state's sovereign powers to tax and to regulate, or to surrender those powers with respect to the cigarette industry altogether. Therefore, contrary to

---

5. Because it is necessary to examine not only the nature of the government's obligation, but also the consequences of enforcing the obligation, respondents' argument that the unmistakability doctrine is inapplicable simply because the settlement agreement was entered into by the state in its proprietary capacity does not adequately address the issue.

respondents' argument, even the risk-shifting analysis of the plurality in *Winstar* requires application of the unmistakability doctrine in the circumstances of this case.

The district court did not rely on the risk-shifting theory, but nevertheless declined to apply the unmistakability doctrine, finding that the settlement agreement "involves neither the eradication [n]or usurpation of [the state's] sovereign power but its assent to a contract, of the nature and type, which the state enters into every day in a variety of situations." If by this reference to "everyday" contracts the court meant that the settlement agreement falls into the category the plurality in *Winstar* described as "humdrum supply contracts," as to which sovereign power is not compromised by enforcement of the promise made, we cannot agree. Rather, as construed by the court and advocated by respondents, the release in the settlement agreement purports to bar the future exercise of the sovereign police powers of the state. It is in this respect that the settlement agreement implicates the unmistakability doctrine.

The district court's conclusion that the release did not infringe on sovereign powers may also be based on its conclusion that the release would not bar the imposition of a tax on respondents' products. The court found that the Health Impact Fee is a "fee," not a tax, and concluded the legislature's imposition of a "fee" is barred by the state's release, although a "tax" would not be barred. It appears that respondents agree, conceding that a "general excise tax" imposed on tobacco products would not be contrary to the release. But respondents contend a revenue measure expressly earmarked to fund tobacco-related health care costs is barred, regardless of whether it is considered a tax or a fee. In terms of applicability of the unmistakability doctrine, however, neither the label "tax" or "fee" nor the specification or lack thereof for spending the funds so generated is relevant. Either way, the revenue measure would be an exercise of the legislature's sovereign power, and, if enforcement of the contractual obligation alleged would block exercise of *a* sovereign power of the state, it matters not whether the particular power negated is the taxing power or the police power.[6]

We therefore conclude that we must apply the unmistakability doctrine in assessing whether, as respondents argue, the settlement agreement effectuated a broad waiver of future claims that includes legislative enactments to recover tobacco-related health care costs. We must examine the language of the settlement agreement to determine not just whether it supports a waiver of the legislature's power to enact future revenue measures expressly intend-

---

6. The state argues that under Minn. Const. art. X, § 1, the taxing power cannot be contracted away, even in unmistakable terms. Article X, section 1, which was enacted after the grant of the railroad charter at issue in the *Great Northern Railway* decision, provides that "[t]he power of taxation shall never be surrendered, suspended or contracted away." This argument would apply if the Health Impact Fee were a tax, but we need not decide that issue, because our resolution of the case under the unmistakability doctrine does not turn on whether it is a fee or a tax.

The Supreme Court has noted that the unmistakability doctrine serves "the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of State authority to limit the subsequent exercise of legislative power." *Winstar,* 518 U.S. at 875, 116 S.Ct. 2432. It serves both of those salutary purposes here as well, also rendering unnecessary rulings on the parties' additional arguments about the scope of the attorney general's authority to bind the state legislature and whether the legislature ratified the settlement agreement.

ed to address the costs of tobacco-related health care, but whether it does so in unmistakable terms. We turn now to that task.

 In doing so, we are guided by the principles of construction stated in *Great Northern Railway* and *Winstar*. We are not to draw inferences from indefinite language or make presumptions from uncertain language. *Great N. Ry. Co.,* 106 Minn. at 322, 119 N.W. at 205; *Winstar,* 518 U.S. at 874, 116 S.Ct. 2432. Rather, the settlement agreement is to be strictly construed, and any waiver of sovereign power must be "in language and terms too clear to admit of doubt." *Great N. Ry. Co.,* 106 Minn. at 322, 119 N.W. at 205; *see also Winstar,* 518 U.S. at 874, 116 S.Ct. 2432.

 Respondents argue that the language of the settlement agreement is sufficiently clear to satisfy the unmistakability doctrine. In particular, respondents argue that the phrase "liabilities of any nature whatsoever" is unequivocally as broad as can be, and the specific reference to "statutory" liabilities and claims makes it clear that legislatively-created liabilities and claims are included in the release. Finally, respondents point to the language in the settlement agreement that references "any future claims for reimbursement for health care costs allegedly associated with use or exposure to Tobacco Products" as clearly defining the waiver in terms of those specific costs.

We disagree. Application of the unmistakability doctrine compels the conclusion that the settlement agreement cannot be construed to waive the legislature's sovereign authority under the tax and police powers to enact revenue measures, even if earmarked for payment of tobacco-related health care costs. We cannot say that the language of the settlement agreement effects such a waiver of the state's sovereign

powers in language "too clear to admit of doubt." *Great N. Ry. Co.,* 106 Minn. at 322, 119 N.W. at 205. Although the phrase "liabilities of any nature whatsoever" is broad, it is insufficiently specific to meet the requirements of the unmistakability doctrine. The language mentions neither the police nor the taxing power. Nor does the language expressly waive the state's right to impose future taxes or fees on respondents or their products, or expressly waive the state's right to further regulate the cigarette industry in the future.

 Moreover, we cannot help but note that the phrase "liabilities of any nature whatsoever" (or similar language) is commonly used in general release forms in disputes having nothing to do with any state sovereign power. Where the language of a contract is argued to surrender sovereign powers of the state, we believe the unmistakability doctrine and the principles on which it is premised require more particularized identification of the waiver intended than is conveyed by boilerplate release language. Accordingly, we construe the settlement agreement not to bar enforcement of the Health Impact Fee.

Our conclusion is buttressed by the fact that key provisions of the settlement agreement are more consistent with the narrower interpretation of the scope of the claims released that is advocated by the state than with the broad waiver of legislative authority advanced by respondents.

One such provision is the clause that defines the claims that are satisfied by the payments respondent manufacturers make each year under the settlement agreement. The clause provides that such payments to the state:

> are in satisfaction of all of the State of Minnesota's claims for damages incurred by the State in the year of such payment

or earlier years *related to the subject matter of this action,* including, without limitation, claims for equitable and injunctive relief, *claims for health care expenditures* and claims for punitive damages.

(Emphasis added.) The satisfaction of claims clearly includes claims for health care expenditures, but it equally clearly is limited to the subject matter of the tobacco litigation. This supports the state's view that even the future payments to be made under the settlement agreement resolve only claims the state could pursue through litigation.

In addition, although the release provision broadly defines the term "claim," using among other language the phrase "liabilities of any nature whatsoever," this "claim" definition is qualified by subparagraphs a and b that limit the source of claims covered by the release. Thus, the release language provides that the state releases all claims (as broadly defined in the initial paragraph):

> b. *for future conduct,* only as to monetary Claims directly or indirectly based on, arising out of or in any way related to, in whole or in part, the use of or exposure to Tobacco Products manufactured in the ordinary course of business, *including without limitation any future claims for reimbursement for health care costs* allegedly associated with use of or exposure to Tobacco Products.

(Emphasis added.) The description of the released claims as relating to "future conduct" is also more consistent with a release limited to claims the state could pursue through litigation than one broadly inclusive of legislative action as well.

Further, it is respondents that are released from "liabilities of any nature whatsoever" by the settlement agreement, not respondents' customers and not respon-

dents' products, although that would be the effect of respondents' arguments. As we have noted, it is retail cigarette purchasers who ultimately pay the Health Impact Fee. Respondent manufacturers have no liability or obligation to pay the Health Impact Fee. Respondent distributors remit the Health Impact Fee to the state when they purchase tax stamps, but they are reimbursed for the Health Impact Fee by cigarette retailers who are, in turn, reimbursed by cigarette purchasers. The settlement agreement specifically bars claims of third-party beneficiaries, yet the effect of respondents' arguments is to extend the benefits of the release to retail cigarette purchasers. The bar against third-party beneficiaries is more consistent, in light of Minnesota's cigarette pricing scheme, with the notion that the settlement agreement resolved only claims that could have been brought against these respondents in future litigation than with the notion that the release ensured that the state would not increase cigarette taxes or fees paid by retail cigarette purchasers if the proceeds are to be used to pay for smoking-related health care costs.

Finally, we note that the specific language in the release related to future claims for health care costs, on which respondents rely so heavily, is inconsistent with their own arguments about the scope of the release. Although respondents and the district court both interpret the limitation imposed by the release on future legislative action as restricted to measures specifically directed at recovery of health care costs, we find no basis for that restriction in the language of the release. Specifically, the language in subparagraph b, expressly referencing claims for future health care costs, contains no such restriction. Instead, what is released are claims for respondents' future conduct based on or related to the use of or exposure to

tobacco products, and claims for reimbursement of health care costs are simply *included* among those claims. Therefore, if the language of the release is construed to limit future legislative action, that limitation would not be restricted by the settlement agreement to action directed at recovery of health care costs, but would be virtually without limit. Just as respondents apparently considered it untenable to suggest that the settlement agreement was intended to effect such a broad waiver of legislative authority, we consider it untenable to adopt such a construction.

We conclude that respondents have failed to sustain their burden to show that the release waives the state's sovereign powers in unmistakable terms. We therefore construe the release of claims in the settlement agreement not to preclude legislative enactment of revenue measures directed at recovering future tobacco-related health care costs generally or the Health Impact Fee in particular. The district court erred in granting respondents' motions to enjoin the imposition of the Health Impact Fee on their products, and erred in granting intervenors' motions to enjoin the imposition of the Health Impact Fee on their products.

## III.

The district court ruled that imposition of the Health Impact Fee not only violated the settlement agreement, but is also unconstitutional as an impairment of contract in violation of the Contract Clause of the Minnesota Constitution, Minn. Const. art. I, § 11. Because we construe the settlement agreement not to waive the legislature's authority to enact future legislative revenue measures to recover health care costs, the enactment of the Health Impact Fee did not impair that agreement and therefore did not violate the Contract Clause.

The district court also ruled that enforcement of the Health Impact Fee against only the intervenors' products would violate their constitutional guarantees of equal protection. Based on our ruling, the Health Impact Fee will be enforced as to respondents' products, and there remains no basis for the intervenors' claim of selective enforcement.

Finally, the district court ruled that respondents and intervenors are entitled to refunds or credits to the extent they paid the Health Impact Fee. Because our ruling is that the Health Impact Fee is enforceable as to respondents' and intervenors' products, there is no basis for refunds or credits.

Reversed.

HANSON, J., took no part in the consideration or decision of this case.

PAGE, Justice (concurring specially).

While I concur in the result reached by the court, I write separately to make two points.

First, the state's 1994 litigation against the major tobacco manufacturers was premised on the notion that the tobacco industry—"not the State of Minnesota, or its citizens"—should pay for the health care costs caused by tobacco use. Despite this premise, nothing in the 1998 settlement agreement between the state and respondents required respondents *themselves* to bear the cost of the settlement. Indeed, as we observed in *Council of Independent Tobacco Manufacturers of America v. State*, the manufacturers simply raised their prices to cover the cost of the settlement. 713 N.W.2d 300, 303–304, 2006 WL 648137, at *2 (Minn. Mar. 16, 2006). As a result, while the state has collected hundreds of millions of dollars in annual payments from tobacco companies thus far under the terms of the 1998 set-

tlement agreement, the lion's share—perhaps all—of the cost of that settlement has actually been borne by smokers.

It also appears that, despite the premise of the 1994 litigation that tobacco companies should pay for the health effects of their products, none of the proceeds from the tobacco settlement have been used to pay for smoking-related health care costs. *See* Act of May 25, 1999, ch. 243, art. 16, § 3(b), 1999 Minn. Laws 2055, 2243 (specifying that annual tobacco settlement payments go to the state's general fund). Indeed, in 2003, the one-time settlement payments designated in 1999 by the legislature for tobacco use prevention and medical education were transferred to the state's general fund. *See* Act of June 8, 2003, ch. 21, art. 11, § 33, 2003 Minn. Laws 1st Spec. Sess. 2418, 2560; Act of May 25, 1999, ch. 245, art. 11, §§ 1–3, 1999 Minn. Laws 2264, 2672.

Now, with the imposition of the Health Impact Fee and the pass-through of that fee/tax to the consumer, smokers are once again paying for the state's smoking-related health care costs—the same costs one could reasonably have hoped were being paid for by the tobacco companies through the 1998 settlement. On the record before us, it cannot be determined whether the settlement payments, combined with the Health Impact Fee, exceed the state's smoking-related health care costs. But, to the extent that what smokers who are not parties to the settlement agreement pay towards the settlement payments and the Health Impact Fee exceeds those costs, this scheme exacts a direct, although hidden, tax on smokers to fund any manner of nonsmoking-related state expenditures.

This hidden tax is neither imposed on nor borne by any other Minnesota taxpayers. Thus, I find this scheme troubling.

Second, while I concur in the result reached by the court, I would reach that result in a different way. I would reach that result in a different way because it is not clear to me that the unmistakability doctrine applies here and because even if it does apply we need not apply it to resolve this case. I read the settlement agreement and its release of "claims" to unambiguously cover no more than the claims the state brought or could have brought against respondents in the 1994 tobacco litigation or could bring in future litigation. Imposition of the Health Impact Fee does not create such a "claim." Therefore, I would hold that under the unambiguous language of the settlement agreement, imposition of the Health Impact Fee did not violate the settlement agreement.[1]

---

1. In the end, respondents' challenge to the imposition of the Health Impact Fee would seem to be much ado about not very much. While complaining about the Health Impact Fee, respondents acknowledge that the state could impose an excise tax in the exact same amount as the Health Impact Fee and they would have no basis to challenge such a tax. Moreover, when all is said and done, the Health Impact Fee as imposed by the legislature is borne not by respondents but by retail cigarette purchasers.