**In re Mary REILAND, Debtor.**

**No. 05–37729.**

United States Bankruptcy Court,
D. Minnesota.

Feb. 28, 2008.

See also 382 B.R. 779, 2008 WL 538985.

Alan E. Brown, Kenneth Corey–Edstrom Larkin Hoffman Daly Lindgren Ltd., Bloomington, MN, for Debtor.

Chad A. Kelsch, Matthew R. Burton, Leonard O'Brien Spencer Gale Sayre, Minneapolis, MN, for Trustee.

ORDER DENYING MOTIONS OF DEBTOR AND STATE OF MINNESOTA FOR RELIEF FROM ORDER OF NOVEMBER 1, 2007

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 7 case came on before the Court on November 27, 2007, for hearing on motions by the Debtor and the State of Minnesota for relief from an order entered on November 1, 2007. The Debtor ap-

peared by her attorney, Kenneth Corey–Edstrom. The State of Minnesota appeared by Paige M. Fitzgerald, Assistant Attorney General. Trustee Patti J. Sullivan appeared in person and by her attorneys, Matthew R. Burton and Chad A. Kelsch. The following order memorializes the decision on the motions.

The matter at bar is another turn in an ongoing contest between the Debtor and the Trustee of her bankruptcy estate. The subject is the right to receive payment under a policy of disability insurance that the Debtor held when she filed for bankruptcy relief, and from which she was receiving substantial benefits at that time. For this case, the Debtor claimed those rights as exempt under Minn.Stat. § 550.39. The Trustee objected to that claim of exemption, on the argument that this statute violated Article I, Sec. 12 of the Minnesota State Constitution, i.e., that it did not limit the subject asset to a reasonable amount or value as the constitutional provision required. After the Court certified the Trustee's exemption pursuant to 28 U.S.C. § 2403(b), the State of Minnesota intervened to defend the constitutionality of the statute.

On November 1, 2007, the Court held that Minn.Stat. § 550.39 did violate the Minnesota constitutional limitation on the power of the legislature to create exemption statutes, and hence was not enforceable against the Trustee in this case. *In re Reiland,* 377 B.R. 232 (Bankr.D.Minn. 2007).

 The Debtor and the State then filed the motions at bar. Both movants request relief from the November 1, 2007 order, in the form of "reconsideration"[1], a vacating of the order, and the entry of a new order that would overrule the Trustee's objection to exemptions.

They style their motions under Fed. R.Civ.P. 60(b)(6), *as incorporated by* Fed. R. Bankr.P. 9024. That rule empowers a federal trial court, "[o]n motion and upon such terms as are just, [to] relieve a party ... from [an] ... order ... for ... (6) any other reason justifying relief from the operation of the" order.[2]

 Counsel for the State acknowledges that this rule allows a final order to be upset only upon a showing of exceptional circumstances. *E.g., In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* 496 F.3d 863, 868 (8th Cir.

1. The Debtor's counsel was the only one to tag the relief he sought with this imprecise term, which does not appear anywhere in the Federal Rules of Civil Procedure. *Schoffstall v. Henderson,* 223 F.3d 818, 827 (8th Cir. 2000). The practice of self-styling a request for relief as a "motion for reconsideration" has long been frowned upon; and it can present "dangers" where the motion is "not described by any particular rule of federal civil procedure." *Sanders v. Clemco Indus.,* 862 F.2d 161, 168 (8th Cir.1988). That situation is not presented here, because both movants' submissions did invoke a specific rule as the basis for their requests. However, one does wonder why counsel persisted in using a trite bit of lawyer's slang, when its mere nomenclature is both provocative (to the judge who has usually put a lot of thought into the issues for the first decision), and not sufficiently evocative (of the rule that would control the scope, direction, and consequences of the judicial inquiry on the request).

2. Effective December 1, 2007, the wording of Fed.R.Civ.P. 60(b) was modified slightly. This motion was argued four days before that effective date; thus, the language in effect when these motions were submitted is the language quoted and applied here. In any event, the changing to the rule's phrasing has no consequence to the considerations here; the amendment functions to make the operative wording more concise, and is "intended to be stylistic only." Comm. Note to Am. to R. 60, REPORT OF CIVIL R. ADVIS. COMM., at 160–161 (June 2, 2006) [accessible at www.uscourts.gov/rules].

2007); *Baxter Int'l, Inc. v. Morris*, 11 F.3d 90, 92 (8th Cir.1993); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 515 (8th Cir.1984). A grant of relief from an order or judgment requires an "intrusion into the sanctity of" its finality. *In re Guidant Corp. Litig.*, 496 F.3d at 868 (quoting *Watkins v. Lundell*, 169 F.3d 540, 544 (8th Cir.1999)).[3]

As the State and the Debtor would have it, exceptional circumstances are presented by Minnesota law's general discouragement of the judicial invalidation of a statute on constitutional grounds, and the novelty of the specific issue. A review of generally-available resources for legal research does show that the relevant analysis under Article I, Sec. 12 of the Minnesota Constitution had never been applied to Minn.Stat. § 550.39, in a published appellate decision. Both movants' counsel profess to have been surprised by the tack taken in the analysis for the November 1, 2007 decision, which used a legal reference point different from the arguments originally made by all three parties. Thus, they maintain, they should be allowed to raise a new, variant legal argument in support of the statute's constitutionality, one more resonant with the analysis adopted by the Court.

 In the abstract, one flaw with this pitch is that Rule 60(b) is not intended to be an avenue through which "a disappointed party may reargue matters already argued and disposed of, [or] . . . a mechanism by which new arguments or legal theories, which could and should have been raised prior to the issuance of judgment, [are] later advanced." *In re DEF Invs., Inc.*, 186 B.R. 671, 681 (Bankr.D.Minn. 1995) (citing various case authority from

the Eighth Circuit and the District of Minnesota). There is no apparent reason why counsel could not have divined the correct focus of analysis under Article I, Sec. 12 from the relevant Minnesota case law in the first place, and raised their current arguments back then.

 Nonetheless, it is appropriate to receive and treat the movants' substantive argument on its merits now—however much that subordinates the abstract but important value of finality in adjudication. As the movants pointed out before and now, the invalidation of a Minnesota statute on constitutional grounds is not to be done unless there is no alternative to the resolution of the contest between the parties before a reviewing court. *State v. Philip Morris USA, Inc.*, 713 N.W.2d 350, 355 (Minn.2006), *cert. denied*, 549 U.S. ——, 127 S.Ct. 1259, 167 L.Ed.2d 75 (2007), *cert. denied*, 549 U.S. ——, 127 S.Ct. 1333, 167 L.Ed.2d 75 (2007) (courts "do not reach constitutional issues if the matter can be resolved otherwise"). *See also, e.g., Soohoo v. Johnson*, 731 N.W.2d 815, 821 (Minn.2007); *Hamilton v. Comm'r of Public Safety*, 600 N.W.2d 720, 722 (Minn.1999); *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn.1988) (all noting that a court exercises its power to declare a statute unconstitutional "only when absolutely necessary"). With that in mind, and to give due respect to these principles through the conduit of the movants' second effort, their argument will be entertained.

In the original decision, Minn.Stat. § 550.39 was held invalid under Article I, Sec. 12, because it failed both parts of the two-step examination required by Minnesota case law precedent. First, the statute

---

**3.** As a result, the outcome of a motion under Rule 60(b)(6) is committed to the trial court's discretion. *Murphy v. Mo. Dept. of Corrections*, 506 F.3d 1111, 1117 (8th Cir.2007);

*Bilal v. Kaplan*, 956 F.2d 856, 857 (8th Cir. 1992); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d at 515; *In re Barger*, 219 B.R. 238, 243 (8th Cir. BAP 1998).

had no language in its text to limit the value protectible under it, by reference to a dollar-amount, another objective external measure, or a judicially-determinable amount that would be "reasonably necessary" for the support of the claiming debtor and the debtor's dependents. 377 B.R. at 237 (citing *Estate of Jones v. Kvamme,* 529 N.W.2d 335, 337 (Minn.1995)). Second, neither the Debtor nor the State had identified a body of law external to the statute, that perforce would be applied to the subject asset when the claiming debtor actually realized on it, and that would always operate in direct or indirect application to limit the intrinsic value of the asset to the debtor. 377 B.R. at 235–237 (citing *Medill v. State,* 477 N.W.2d 703, 706–707 (Minn.1991)).

Responding now to that analysis, the movants are trying to satisfy the latter requirement. They argue that the law of "insurable interest" imposes the requisite external limitation to this class of asset. The vehicles of this governance, they propose, are the Minnesota and general common law applicable to insurance coverage, and the corollary authority of Minnesota statutes that govern specific sorts of insurance coverage.

 Under Minnesota law, an insured may not recover under a policy for casualty coverage unless the insured has an "insurable interest" in the subject of the policy and the insurance. *Crowell v. Delafield Farmers Mut. Fire Ins. Co.,* 453 N.W.2d 724, 726 (Minn.App.1990), *aff'd,* 463

N.W.2d 737 (Minn.1990); *Casablanca Concerts, Inc. v. Am. Nat'l Gen. Agencies, Inc.,* 407 N.W.2d 440, 443 (Minn.App.1987), *rev. denied* (Minn. August 12, 1987). To be an insurable interest, the property right must be such that its loss would be "substantial and real." *Anderson v. State Farm Fire & Cas. Co.,* 397 N.W.2d 416, 418 (Minn.App.1986), *rev. denied* (Minn. February 18, 1987).

 In one sense of the word, this generally-governing law imposes a limitation on the value of the insured's rights under the policy. An insured cannot compel an insurer to pay it anything upon a putative loss of the subject asset, or in consequence of any other incident involving the asset, unless the insured had an identifiable legal or equitable interest in the asset when the loss or event occurred. *Bettinger v. Northwestern Nat'l Cas. Co.,* 213 F.2d 200, 207 (8th Cir.1954), *cert. denied,* 348 U.S. 856, 75 S.Ct. 80, 99 L.Ed. 674 (1954). And, because the insurer's general duty of indemnification goes no further than the value of that interest, an insured cannot force payment in any greater amount than that, no matter what the policy's facial amount of coverage may be, unless the insurer and the insured have expressly arrived at that value with reference to actual conditions as they obtained at the issuance of the policy.[4]

 However, that sense of a limitation is really only connotative; the State constitutional analysis gives a denotative meaning to the concept. It is clear from

---

4. The rationale of this principle is that allowing any recovery on a casualty loss or other insured event that would be greater than the value of the financial detriment actually incurred would sanction wagering on the part of the insured, and even promote intentional destruction of insured assets—contrary to fundamental public policy in both regards. *Casablanca Concerts, Inc.,* 407 N.W.2d at 443–444. *Cf. In re Peterson's Estate,* 203 Minn.

491, 281 N.W. 877, 878 (1938). As a reflection of this public policy, fire and casualty insurers in Minnesota are barred from "knowingly issu[ing] any policy upon property in this state for an amount which, together with any existing insurance thereon, exceeds the replacement cost of the buildings and any other covered improvements on the property." Minn.Stat. § 65A.09, subd. 1.

*Estate of Jones v. Kvamme* that the external legal governance must itself include "objective criteria ... which limit the total that might be accumulated" or enjoyed by the debtor. 529 N.W.2d at 338. And, that total must still be limited to the same sort of specified value, size, or close proportionality to reasonable but modest needs of life that would govern a limitation internal to the exemption statute itself. *Id.* Thus, in *Kvamme* it was not enough that the federal Internal Revenue Code imposed limitations on the amount of a debtor's annual deposits into the tax-deferrable individual retirement account that was subject to a Minnesota state exemption from the claims of creditors. Because the Internal Revenue Code's extrinsic statutory framework did not impose a limit on the "rate of return an individual might achieve" on the investment of the deposited funds, there was no limit legally imposed on the *total* that an individual might accumulate. Thus, the protection of the statutory ex-

emption exceeded the legislature's power to grant it. 529 N.W.2d at 338.

■ Here, under the same considerations, the more broadly-phrased principles of the law of insurable interests do not qualify as an extrinsic limitation under law.

■ In the first place, there is nothing "objective" about the ostensible limitation. Its reference point, the actual value of any individual insured's income that was lost by reason of personal disability, is specific to the situation of each insured.[5] The outside value of the benefit to the insured would be determined against a completely individualized factor, one unique to the insured. As such, this engrafted measure of protection would be completely divorced from any possible balancing of the interests of debtors and their creditors, as the constitutional provision contemplates.[6] *Poznanovic v. Maki*, 209 Minn. 379, 296 N.W. 415, 417 (1941).[7] The lack of any cap

5. Put a more concrete way: if applied in its original context, to a contest between an insured and her disability insurer, the law of insurable interests would cap the amount of benefits the insured could receive to the level of her own pre-disability income, or some fraction of it. That base income could be fifty cents per month, or it could be ten million dollars per month—but it would be different in every single case.

6. The situation at bar is emblematic of this point. The amount of the Debtor's monthly benefit payment was approximately $8,500.00 per month at relevant times. (This was found as fact in the earlier order, 377 B.R. at 237, n. 5.) This was only a fraction of the amount of the Debtor's personal, business-derived income at the time that her insurer issued the policy and the prospective benefit amount was contracted; but from any objective viewpoint the value of this entitlement to periodic benefits was far more than the amount necessary to maintain a safe but modest existence, and yet the face of Minn.Stat. § 550.39 would necessarily protect it from the Debtor's creditors in its entirety. (By contrast, the Minne-

sota statutory exemption for actual earned income allows a wage earner to be deprived of up to 25% of accrued disposable earnings. *See* Minn.Stat. §§ 550.37, subd. 13 and 571.922.)

7. In this opinion, the Minnesota Supreme Court articulated the constitutional framers' recognition that "an exemption ... protect[s] a debtor and his family against absolute want by allowing them out of his property some reasonable means of support and education and the maintenance of the decencies and proprieties of life." 296 N.W. at 417. But inherent in the notion of a "reasonable means of support" and those "decencies and proprieties of life," is a balancing of property rights as between debtors and their creditors. Exemption statutes lie against the backdrop of common law, under which all of a debtor's property was subject to levy at the instance of creditors; the choice of the word "reasonable" clearly contemplated the legislatively-determined allowance of enough to secure personal and family safety, security, and relative independence, but no more. *In re Medill*, 119 B.R. 685, 688, n. 5 and 692 (Bankr.

to the growth of exemptible aggregate value in an IRA left the exemption in *Kvamme* without an externally-imposed limit that met the constitutional requirement, despite the Internal Revenue Code's ostensible limit on the input of principal. To equal result here, the lack of any external cap on the aggregate value of received periodic benefits leaves this statute fatally deficient under Article I, Sec. 12—despite the common law's restriction on the amount that any individual insured could compel its insurer to pay on qualification.[8]

One other point goes to this analysis, raised by the State more explicitly in its original submissions on the Trustee's objection but suggested in oral argument on this motion as well. To support its argument that the rationale of *Medill v. State* controls here and saves this statute from invalidation, the State equates the operation of the extrinsic law of general damages on the personal injury right of action at stake in *Medill* to that of the law of insurable interests on the rights to payment entailed here. The point seems to be that in both instances litigation in the courts between the obligee and the obligor on the underlying claim would limit any in-hand realization to the value of the actual loss; and because the appellate court in *Medill* held that this met the constitutional requirement for the personal injury exemption, the backdrop legal framework here should be deemed to do so as well.

This argument does not recognize the uniqueness of the asset in *Medill,* on which the Minnesota Supreme Court dwelt at length and which fundamentally channeled its discussion of the constitutional issue there. A right of action in damages for personal injury has no specific value attached to it at its creation. It is liquidated only through submission of the claim to a court, or via consensual settlement. The appellate court in *Medill* refused to consider a personal injury claim as deliberately created by the person who holds and would exempt it from creditors, 477 N.W.2d at 709; it recognized that the law of damages for such a claim specifically redresses the unique value of the person, 477 N.W.2d at 708; and it observed that both the damages award and an exemption of it from creditors' claims preserve "human capital," in an "attempt to render that person whole," and promote the future well-being of the injured party and his or her dependents, 477 N.W.2d at 708–709.

█ Trial courts should not speculate loosely about the subtext of an appellate opinion. Nonetheless, in *Medill* the Minnesota Supreme Court clearly rejected a result in which the constitutional mandate could lever a legislative determination of the "reasonable" value of an individual's person, via the exemption laws. *See* 477 N.W.2d at 708. Ultimately, one really cannot gainsay the thought—given the respect

D.Minn.1990); *quest. certified on appeal answered, Medill v. State,* 477 N.W.2d 703 (Minn.1991).

8. At the risk of being histrionic, a reference to a case scenario more extreme than the one at bar best highlights the point. Under the statute as written, a multi-billionaire with a large current earned income who had contracted for disability insurance commensurate with that, could keep as exempt the current benefits of a policy paying hundreds of thousands, or millions, of dollars per year. As measured against any conceivable notion of reasonable needs for the basic sustenance of life, this would be far out of balance. (For that matter, it could not jibe with the fact that some substantial dollar-amount from that same person's pre-disability earned income would be subject to garnishment and levy under the statutes cited in n. 6.) That, in a potential real-life scenario, is what the constitutionally-mandated limitation is all about, in application to an asset of the type at bar.

for the dignity of the individual that is central to American values.[9]

However, the asset here differs in material respects from that in *Medill,* and in ways expressly recognized by the Minnesota Supreme Court. The disability insurance benefits here had a specific dollar-value assigned to them when the Debtor's inchoate right to receive them was created under contract. They retained that value (adjusted upward per an index) through and after her bankruptcy filing. While disability insurance benefits serve a compensatory function, their *amount* is not identified to any specific body part or function, or keyed to its loss or impairment. (This contrasts with, for instance, benefits under an accidental-death-and-dismemberment policy.) Nor is the amount contractually related in any way to a form of psychological impairment, or any other disability inflicted on the insured's physical person or psyche.[10] The benefits relate directly to a purely *financial* attribute of the insured's pre-disability life, the amount of income that happened to be earned at a fixed point, and which was to be replaced in whole or in part via insurance benefits. In citing *Bailey's* distinction between "property in the nature of a debtor's person" and "property in the nature of ... monetary and financial accounts of a debtor," the Minnesota Supreme Court in *Medill* was clearly justifying the deference it gave to the former, toward its recognition of the law of general damages as an extrinsic source of limitation to meet the consti-

tutional mandate. But, it went on to acknowledge that *Bailey* had invalidated the exemption as applied to a right of action for special damages, including "actual lost wages." 477 N.W.2d at 705–706 (citing *In re Bailey,* 84 B.R. at 611–612). Later, it came close to an advisory opinion by stating that, as to special damages, "the bankruptcy court's analysis in *Bailey* appears reasonable and is likely to be applied here in future cases." 477 N.W.2d at 708.

Thus, if *Medill v. State* is to serve as any sort of corollary authority due to the nature of the subject asset, it cuts with significant strength against the constitutionality of Minn.Stat. § 550.39. In *Medill v. State,* the Minnesota Supreme Court clearly did not categorize a recovery in the nature of an income replacement or an income surrogate as a compensation for injury to the person that was protectible under a constitutionally-valid statute within its rationale.

The source of limitation in extrinsic law that the State and the Debtor propose via this motion does not meet the requirements of the Minnesota Supreme Court's interpretation of Article I, Sec. 12 of the Minnesota Constitution. The November 1, 2007 order is not fundamentally erroneous in its result, that Minn.Stat. § 550.39 violates that constitutional provision and is unenforceable against the Trustee in this case. There is no basis before the Court

---

9. This probably is not a matter of deconstructed subtext anyway. In *Medill v. State,* the Minnesota Supreme Court was presented with a split between the judges of this court on the issue presented to it. That split was manifested by *In re Bailey,* 84 B.R. 608 (Bankr.D.Minn.1988) and *In re Medill,* 119 B.R. 685 (Bankr.D.Minn.1990). In passing on that split, the Minnesota Supreme Court cited *Bailey* with strong approval; adopted its rationale; and reprised its ruling to sustain the statute from the constitutional challenge.

The *Bailey* court had expressed an abhorrence at allowing creditors to seize any portion of a judicial award that was directly attributable to the value of a debtor's person, going so far to use the Shakespearean "pound of flesh" metaphor. 84 B.R. at 610–611.

10. The *qualification* to receive the benefits is so keyed, but that is irrelevant to the analysis under *Medill v. State.*

for vacating that order.[11]

IT IS HEREBY ORDERED that the motions of the Debtor and the State of Minnesota for relief from the order entered on November 1, 2007 [Dkt. No. 95] are denied.

11. An intervening development in this case makes it necessary to say one more thing, in recognition of the dictate of judicial restraint in constitutional adjudication under Minnesota jurisprudence. After the entry of the November 1, 2007 order, the Debtor amended her Schedule C to invoke a different Minnesota statute to exempt this asset. However, that action did not moot the constitutional issue posed by the continuing pendency of the motion at bar; it still is necessary to treat the constitutional issue, and the potential of an invalidation of Minn.Stat. § 550.39 is not to be avoided. The Debtor's amendment *added* Minn.Stat. § 550.37, subd. 24 to the legal authority for her claim of exemption; she did not withdraw her prior claim of exemption under Minn.Stat. § 550.39. The newly-invoked statute has a cap on the value exempti- ble under it, expressed in terms of a "floor" amount of present value absolutely exempt, plus that portion of the remainder of the asset's value that would be reasonably necessary to the Debtor's support. Minn.Stat. § 550.39, however, would protect the full value of her rights in the asset, if applied on its face. Because the Debtor continues to claim the benefit of both exemptions, there is still a "live" contest between her and the Trustee as to that portion of the value of the asset that would exceed that portion protectible under Minn.Stat. § 550.37, subd. 24. (The Trustee timely objected to the claim of exemptions as augmented by the amendment. An order on that objection is being entered contemporaneously with this one, and further proceedings will be required to dispose of the issues presented there.)